Filed 5/24/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ALBERT LUGO RUEDAS<br><br>on Habeas Corpus. | G054523<br><br>(Super. Ct. No. 08CF2288)<br><br>O P I N I O N |

Original proceeding on a petition for a writ of habeas corpus after a judgment from the Superior Court of Orange County, James Edward Rogan, Judge. Petition denied.

Elizabeth Garfinkle, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Respondent.

The jurisprudence of retroactivity is a labyrinthine edifice of both critical importance and daunting complexity. It is located at one of those intersections of freedom, justice, and pragmatism that are all too common in the criminal law, and make its practice a humbling experience. In this case, we are asked to offer our best judgment about whether the rule announced in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) is prospective or retroactive. We do so with a caution bordering on apprehension, but we arrive at a firm conclusion the rule is prospective only.

Petitioner Albert Lugo Ruedas was charged with various gang-related crimes and enhancements, including the special circumstances allegation he committed murder to further the activities of a criminal street gang. To prove the gang charges, the prosecution called an expert witness who based his opinions on a variety of extrajudicial sources, including testimonial hearsay. When defense counsel objected to the expert's reliance on this evidence, the trial court overruled the objection and instructed the jury not to consider the evidence for its substantive truth, but only as a basis for the expert's opinions. Ultimately, the jury convicted petitioner as charged, and the trial court sentenced him to life in prison without parole. We affirmed the judgment on appeal, and it became final in 2015.

The following year, the California Supreme Court decided the *Sanchez* case. *Sanchez* held that to properly evaluate an expert witness' opinions, the jury generally must consider the evidence he relies on for the truth of the matter asserted therein, and therefore that evidence is subject to exclusion under the hearsay rule and the Confrontation Clause of the Sixth Amendment to the United States Constitution. In this proceeding, petitioner asks us to apply *Sanchez* retroactively to his case and find the gang expert's reliance on testimonial hearsay violated his confrontation rights. But we hold *Sanchez* does not apply retroactively to cases like petitioner's that were already final by the time *Sanchez* was decided. Therefore, petitioner cannot avail himself of that decision, and we deny his petition for a writ of habeas corpus.

2

FACTS AND PROCEDURAL HISTORY

A detailed statement of the facts is set forth in our prior opinion in *People v. Ruedas* (Nov. 14, 2014, G048545) [nonpub. opn.], which we incorporate by reference.[1] In summary, Daniel Lopez was attacked and fatally shot by two men as he was walking in Santa Ana late one evening in 2008. Five days later, the gun used in the shooting was found in petitioner's possession, and when interviewed by the police, petitioner admitted he shot Lopez during an attempted robbery.

During his interrogation, petitioner also answered questions about his gang status. He said he "used to bang" with the Anaheim Boys gang, aka Boys from the Hood but had stopped hanging out with them about three years earlier, when he turned 18. He said he had to pay a "tax" of $10,000 to get out of the gang and suggested he "jacked" Lopez because he wanted to get money for the tax.

Petitioner's trial commenced in 2013. Testifying as an expert witness, Anaheim gang investigator Jonathan Yepes told the jury that gang members commit crimes to spread fear and gain respect. And when they commit a crime such as robbery, it not only benefits them personally, it also helps their gang because it brings in money and sends a message the gang is not to be trifled with. According to Yepes, robbery was one of the primary activities of Boys from the Hood when this case arose in 2008. He said petitioner first got involved with that gang in 2004, and he was a full-fledged member when he shot Lopez four years later. Yepes also believed petitioner's companion during the shooting was a member of Boys from the Hood.

Yepes based his opinions on a variety of sources. He said he relied on information he acquired from personally investigating Boys from the Hood's criminal activities and talking to its various members. In addition, he considered information he acquired by reading books about gangs, speaking with other police officers, and attending

---

[1] We also judicially notice the appellate record in that case. (Evid. Code, § 452, subd. (d).)

3

meetings of the California Gang Investigators Association. Yepes testified these are standard ways gang investigators acquire knowledge about gang activity and ongoing trends within the gang culture.

Yepes also relied on certified court documents showing Boys from the Hood members other than petitioner have engaged in gang-related criminal conduct in the past. This evidence was used to support his opinion that Boys from the Hood constituted a criminal street gang under California law. He said Boys from the Hood had the dubious distinction of being one of only three gangs served with a civil injunction in Anaheim.

In forming his opinions about the case, Yepes relied on other sources of information, as well. These included police reports from this case and others, field interview cards that were prepared by officers during street encounters with suspected gang members, and S.T.E.P. notices, which are designed to inform individuals of the consequences of associating with members of a criminal street gang.[2] Yepes not only identified these materials during his testimony, he divulged a considerable amount of information contained therein. The record is somewhat unclear as to what specific information he derived from which particular materials, but Yepes described several incidents during which petitioner was stopped by the police in 2004 and 2005, a few years before the shooting.

Yepes explained that during one of those incidents, petitioner was in a park with a group of Boys from the Hood members. Upon seeing the police, the group tried to flee, but they were detained. Another time, petitioner was given a S.T.E.P. notice for congregating with Boys from the Hood members. And on yet another occasion, the police found spray paint cans and items covered with gang writing in petitioner's car

---

[2] S.T.E.P. is an acronym for the California Street Terrorism Enforcement and Prevention Act set forth in Penal Code section 186.20 et seq. Unless noted otherwise, all further statutory references are to the Penal Code.

during a traffic stop. That stop was unrelated to a separate incident during which petitioner was detained in Fullerton and found to have a gun in his car.

In addition to these police contacts, Yepes testified that when the police executed a search warrant at the residence of Boys from the Hood member Julio Ortiz in 2005, they found several photos showing petitioner making gang signs with members of that gang. They also discovered a letter that was written from petitioner to Ortiz. Among other things, the letter states, "We stand as a family" and "Can't stop, won't stop Anaheim Boys." Although Yepes did not personally seize this letter during the search, he reviewed it as part of his preparation for testifying in this case. Yepes also relied on a series of notes that were prepared by the prosecutor. On cross-examination, Yepes admitted the notes were like a "script" that contained information about petitioner and his fellow gang members.

Yepes also based his opinions on the fact petitioner has a gang moniker, "Gizmo," and he has the word "Anaheim" tattooed across his back. Yepes interpreted the tattoo as a sign petitioner was a loyal member of Boys from the Hood. He said he also got that impression from reading the statements petitioner made when he was interviewed by the police in this case.

Explaining his thought process, Yepes stated that no one particular source of information he reviewed was dispositive of his opinions about the case. Rather, he considered all of the above-mentioned information in coming to the conclusion Boys from the Hood was a criminal street gang and that petitioner was a member of the gang when he murdered Lopez.

Throughout Yepes' testimony, defense counsel repeatedly objected on hearsay grounds. He was concerned that in discussing the various bases for his opinions, Yepes was disclosing prejudicial information the jury would be inclined to consider for its substantive truth. The trial court overruled defense counsel's objections, but in recognition of this concern, it advised the jury the basis evidence for Yepes' opinions was

5

"not being offered for the truth of the matter asserted[.]" "The court is receiving it for the limited purpose of how it relates to [Yepes'] ultimate opinion[s] . . ., so you are to consider it only for that purpose."

In the end, the jury convicted petitioner of first degree murder and active participation in a criminal street gang. (§§ 187, subd. (a), 186.22, subd. (a).) It also found true special circumstance allegations the murder was gang related and committed during the course of an attempted robbery. (§§ 190.2, subds. (a)(17) & (a)(22).) In addition, the jury found true enhancement allegations petitioner committed the murder to benefit his gang and by means of intentionally discharging a firearm. (§§ 186.22, subd. (b), 12022.53, subd. (d).) The trial court sentenced him to prison for life without parole for the murder, plus 25 years to life on the firearm enhancement, and stayed sentence on the remaining terms.

On appeal, petitioner did not challenge the admissibility of Yepes' testimony in any respect. He did argue insufficient evidence, instructional error, prosecutorial misconduct, ineffective assistance of counsel, and evidentiary error in the admission of his confession, but we rejected those claims and affirmed the judgment in its entirety. (*People v. Ruedas, supra,* G048545 at pp. 2-17.) The California Supreme Court denied review, and since petitioner did not file a petition for a writ of certiorari in the United States Supreme Court, the judgment against him became final 90 days later, on April 28, 2015. (*Clay v. United States* (2003) 537 U.S. 522, 527; *People v. Vieira* (2005) 35 Cal.4th 264, 306.)

DISCUSSION

In 2016, the California Supreme Court decided *Sanchez.* *Sanchez* involved the same situation presented in this case: an expert witness relying on hearsay evidence in forming his opinions about the defendant's gang status. In a departure from established precedent, *Sanchez* held that while an expert witness may base his opinions on hearsay evidence, he cannot divulge the contents of that evidence to the jury unless it fits within

6

an exception to the hearsay rule.  And if the hearsay is testimonial, it must also satisfy the Sixth Amendment's Confrontation Clause.  Here, the parties agree that gang expert Yepes conveyed testimonial hearsay to the jury in violation of petitioner's confrontation rights, as interpreted in *Sanchez*.  The question is whether *Sanchez* applies retroactively in this collateral proceeding.  For the reasons explained below, we conclude it does not.

*Constitutional Framework*

*Sanchez*'s retroactivity cannot be examined without analyzing the doctrinal underpinnings and historical context of that decision.  At its core, *Sanchez* is a case about the scope and reach of the Sixth Amendment's Confrontation Clause.  Long considered an essential component of due process (*Pointer v. Texas* (1965) 380 U.S. 400, 404), the clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  (U.S. Const., 6th Amend.)

The confrontation clause not only affords defendants the right to personally examine adverse witnesses, it also "'(1) insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.'  [Citation.]  [¶] The combined effect of these elements of confrontation . . . serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings.  [Citations.]"  (*Maryland v. Craig* (1990) 497 U.S. 836, 845-846.)

The common law rule barring the admission of hearsay evidence – out of court statements used to prove the truth of the matter asserted therein – is likewise designed to enhance the reliability of trial evidence.  (See *United States v. Winters* (6th

Cir. 1994) 33 F.3d 720, 723 [citing the reliability of evidence and the opportunity for cross-examination as the twin goals of the hearsay rule]; McCormick on Evidence (2d ed. 1972) § 250 at pp. 598–99 [the hearsay rule is intended to guard against "imperfections of perception, memory, and narration"].) To that end, the rule generally precludes the jury from considering extrajudicial statements that are relayed through a witness other than the declarant. (Evid. Code, § 1200, subd. (b).) Like all evidentiary rules, this prohibition aims to ensure "both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.)

In *Ohio v. Roberts* (1980) 448 U.S. 56 (*Roberts*), the United States held the admission of hearsay evidence does not violate the Sixth Amendment if it bears "adequate 'indicia of reliability.'" (*Id*. at p. 66.) Finding a close relationship between the hearsay rule and the confrontation clause, the *Roberts* court ruled, "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ibid*., fn. omitted.)

But a quarter-century later, *Roberts'* indicia-of-reliability test was scrapped in favor of a different standard in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). After tracing the historical development of the Sixth Amendment, *Crawford* rejected the idea that application of the confrontation clause should turn primarily on the rules governing the admissibility of evidence. (*Id*. at pp. 50-51.) While recognizing that the ultimate goal of both the hearsay rule and the confrontation clause is to ensure the reliability of trial evidence, the court determined that when the state seeks to introduce a hearsay statement testimonial in nature, i.e., made under circumstances indicating it would later be used at trial, it must show the declarant is unavailable and the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 61, 68.) Because this test pertains only to testimonial statements, it means nontestimonial statements are not subject to exclusion under the confrontation clause, even if they are unreliable. (*Davis v.*

8

*Washington* (2006) 547 U.S. 813, 821; *United States v. Larson* (9th Cir. 2007) 495 F.3d 1094, 1099, fn. 4.) Nevertheless, *Crawford* determined this test was consistent with the framers' intent and preferable to *Roberts'* reliability standard, which it described as "malleable," "amorphous," and "unpredictable." (*Crawford, supra,* 541 U.S. at pp. 60, 63.)

After *Crawford*, the hearsay rule ceased to be the primary guiding principle in determining whether out-of-court statements are admissible under the Sixth Amendment. Nonetheless, the hearsay rule and the confrontation clause still have one thing in common: Neither is implicated unless the extrajudicial statement at issue is admitted for its substantive truth. (Evid. Code, § 1200, subd. (a); *Crawford, supra,* 541 U.S. at p. 59, fn. 9.) That is a key point to keep in mind when it comes to understanding how courts have analyzed hearsay evidence in the context of expert witness testimony, an issue to which we now turn.

*Expert Basis Evidence*

At common law, expert witnesses were only allowed to testify about matters they had personally observed or facts proven at the trial in which they were testifying. (Volek, *Federal Rule of Evidence 703: The Back Door and the Confrontation Clause, Ten Years Later*, 80 Fordham L.Rev. (2011) 959, 962.) With limited exceptions, they were not permitted to base their opinions on extrajudicial sources that were not subject to cross-examination. (*Id.* at pp. 965-967.) Over time, however, the strict common law rule eventually gave way to a more flexible approach, as reflected in the California rules of evidence. Those rules allow experts to rely on any such matter – including hearsay evidence – that is reasonably relied upon by experts in their field. (Evid. Code, § 801.) And they permit the expert to disclose the contents of those materials to the jury, regardless of whether they would be admissible in their own right. (Evid. Code, § 802.)

9

The benefit of this practice is that it provides the jury with information from which it can ascertain the reliability of the expert's opinions. "If the jury does not know the underlying facts or bases for an expert's conclusions, it is difficult to see how the jury could rationally asses the plausibility of the expert's judgment." (J. Mnookin, *Expert Evidence and the Confrontation Clause after Crawford v. Washington*, 15 Journal of Law and Policy (2008) 791, 802.) On the other hand, when an expert is allowed to relate information to the jury that is not subject to cross-examination, it opens the door to prejudicial hearsay that would not otherwise be admissible at the trial. "[S]o long as experts may rely on inadmissible factual matters as the bases for their conclusion, there is an inevitable tension between jury education and adherence to the rest of the rules of evidence." (*Id*. at p. 803.)

To prevent expert witnesses from becoming mere conduits for the introduction of prejudicial hearsay, courts established various safeguards. The preferred approach in California was to instruct the jury that "matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 919 (*Montiel*).) In *Montiel*, the California Supreme Court recognized there may be instances where a limiting instruction of this nature would be insufficient to overcome the prejudice occasioned by the introduction of expert basis evidence. (*Ibid*. [noting "Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value."].) But the court stated a limiting instruction would suffice in most cases (*ibid*.), and that became the prevailing view in California. Indeed, in *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*), the California Supreme Court expressly approved the use of hearsay evidence to support a gang expert's opinions on the theory the evidence was not admitted for its substantive truth. (*Id*. at pp. 612, 618-620; see also *Sanchez, supra*, 63 Cal.4th at p. 683, discussing *Gardeley*.)

10

In theory, this approach avoided problems with the hearsay rule and the confrontation clause because those precepts only apply to out-of-court statements that are used to prove the truth of the matter asserted therein. Eventually, however, courts began to question whether, for purposes of the Sixth Amendment, there was actually a meaningful "'distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion[.]'" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1130, quoting *People v. Goldstein* (N.Y. 2005) 843 N.E.2d 727, 732-733.)

In 2012, the United States Supreme Court grappled with this question in *Williams v. Illinois* (2012) 567 U.S. 50 (*Williams*). *Williams* involved a sex crime that was solved with DNA evidence. During a bench trial, the prosecution called an expert forensic specialist who testified a DNA profile derived from semen found inside the victim matched a DNA profile that was generated from a sample of the defendant's blood. (*Id*. at p. 56.) That testimony was used to establish the defendant was the source of the semen, but because the DNA profile derived from the semen was produced by an outside lab, Cellmark, the expert did not have any personal knowledge about how it was made. (*Id*. at pp. 61-62.) Consequently, she had to rely on Cellmark's report – which was not admitted into evidence – in forming her opinions about the case. (*Id*. at p. 62.) The question before the high court was whether this procedure violated the defendant's right to confront the people who contributed to the making of the report.

Justice Alito, joined by Chief Justice Roberts, Justice Kennedy and Justice Breyer, believed the expert's reliance on the Cellmark report was constitutionally permissible because she only used the report as a foundation for her opinions, not for its substantive truth. In the view of these four justices, "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Williams, supra*, 567 U.S. at p. 58.)

11

However, a majority of the justices – consisting of the four dissenters and a concurring-in-part vote from Justice Thomas – rejected this notion.  (*Williams, supra*, 567 U.S. at pp. 103-141.)  In their view, when an expert witness relies on an extrajudicial statement as the basis for his or her opinions, "the statement's utility is then dependent on its truth.  If the statement is true, then the conclusion based on it is probably true; if not, not.  So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies."  (*Id*. at p. 126, Kagan, J., with whom Justice Scalia, Justice Ginsburg and Justice Sotomayor joined, dissenting; see also Justice Thomas' concurring opinion at p. 106, in which he concluded, "There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth."].)  Although *Williams* ultimately upheld the defendant's conviction on the basis the Cellmark report was nontestimonial,[3] the opinion adumbrated the demise of the not-admitted-for-its-truth paradigm that had so long governed the admissibility of expert basis evidence in California.

As did the California Supreme Court's decision in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), which was decided shortly after *Williams*.  As in *Williams*, *Dungo* was ultimately decided on the ground the expert basis evidence in question (an autopsy report) was not testimonial.  (*Id*. at pp. 616-621.)  However, all six justices who opined on the issue agreed substantive truth was essential to the evidence's admissibility, and therefore had it been testimonial, it "would have been inadmissible under *Crawford*." (*Id*. at p. 627 [conc. opn. of Werdegar, J., joined by Cantil-Sakauye, C. J., Baxter, J. and Chin, J.]; see also *id*. at p. 635, fn. 3 [dis. opn. of Corrigan, J., joined by Lui, J.].)[4]

---

[3] Justice Thomas joined Justices Alito, Roberts, Kennedy and Breyer on that point.  (*Williams, supra*, 567 U.S. at pp. 110-118.)

[4] Justice Kennard, who authored the majority opinion in *Dungo*, did not weigh in on this issue.

Following *Williams* and *Dungo*, the law was in an odd state of flux. Those decisions signaled "a five justice majority of the high court and at least six of the seven justices on the California Supreme Court . . . agree that, for purposes of the confrontation clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert . . . .' [Citation.]" (*People v. Mercado* (2013) 216 Cal.App.4th 67, 89, fn. 6.) However, neither the United States Supreme Court nor the California Supreme Court had squarely held as much in a majority opinion. That changed in 2016, when our state's highest court handed down its ruling in *Sanchez*.

### *The Sanchez Decision*

The *Sanchez* case arose in Orange County. As petitioner does here, the defendant in that case challenged the testimony of an expert witness that was used to prove his crimes were gang related. The case turned on whether the expert's recitation of hearsay evidence in the form of police reports, a S.T.E.P. notice and a field interview card was permissible. The defendant argued this practice violated his Sixth Amendment right to confront the people who prepared those documents. However, we construed *Gardeley, supra*, 14 Cal.4th 605 as binding authority to the contrary. Based on *Gardeley*'s rationale that expert basis evidence is not admitted for its truth, we ruled its admission did not implicate the defendant's confrontation rights. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, revd. in part and affirmed in part in *Sanchez, supra*, 63 Cal.4th 665.)[5]

On further review, the California Supreme Court rejected *Gardeley*. Finding "the reasoning of a majority of the justices in *Williams*" to be "persuasive,"[6] the

---

[5] We were not the only court to rule in this fashion. In the post-*Crawford* era, several other courts rejected confrontation claims based on the reasoning of *Gardeley*. (See, e.g., *People v. Steppe* (2013) 213 Cal.App.4th 1116, 1127; *People v. Hill, supra*, 191 Cal.App.4th at p. 1131; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.)

[6] By "a majority of the justices in *Williams*," our Supreme Court was referring to the four dissenting justices and Justice Thomas. (See *Sanchez, supra*, 63 Cal.4th at pp. 681-684.)

13

court adopted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at pp. 684, 686.) Consequently, "hearsay and confrontation problems [can no longer] be avoided by giving a limiting instruction that such [evidence] should not be considered for its truth." (*Id*. at p. 684.) In so holding, the Supreme Court disapproved of *Gardeley, Montiel* and other cases that had ruled otherwise. (*Id*. at p. 686, fn. 13.)

*Sanchez* "restore[d] the traditional distinction between an expert's testimony regarding background information and case-specific facts." (*Sanchez, supra*, 63 Cal.4th at p. 685.) As was the case at common law, *Sanchez* determined experts may relate hearsay that is accepted in their area of expertise or supported by their own experience, but they generally may not relate hearsay that pertains to the events at issue in the case at hand – very much what the common law rule had been. (*Id*. at pp. 675-676, 685.) In the latter situation, involving case-specific facts, the proponent of the evidence must show it fits within an exception to the hearsay rule. (*Id*. at p. 676.) And if the evidence is testimonial in nature, then per *Crawford*, "there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686.)

There was no question the expert basis evidence in *Sanchez* was case-specific given its specificity on the gang enhancement allegations. The real dispute centered on whether that evidence was "testimonial" for purposes of the confrontation clause. While recognizing that the precise contours of that term are still being fleshed out by the courts, *Sanchez* determined evidence generally will be considered testimonial if it was obtained for the purpose of preserving facts for trial. (*Sanchez, supra*, 63 Cal.4th at pp. 687-694.) Applying that test, the *Sanchez* court determined the police reports and S.T.E.P. notice at issue in that case were testimonial because they were formally prepared for later use at trial. (*Id*. at pp. 694-697.) The court was unable to tell whether the field

14

interview card at issue there was testimonial given the confusing nature of the evidence surrounding its origin. (*Id*. at p. 697.) However, it stated, "If the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Ibid*.)

Irrespective of that issue, *Sanchez* determined the gang expert's recitation of information contained in the police reports and S.T.E.P. notice violated the defendant's Sixth Amendment right to confront his accusers. (*Sanchez, supra*, 63 Cal.4th at pp. 694-697.) And because that information was the primary evidence in support of the gang enhancement allegations, the court could not say its admission was harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th at p. 699.) Therefore, it reversed the jury's true findings on those allegations. (*Id*. at p. 700.)

In the course of its analysis, the *Sanchez* court also addressed the broader implications of its holding regarding expert basis evidence. While acknowledging it would generally bar experts from disclosing "case-specific facts asserted in hearsay statements," the court clarified that an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez, supra*, 63 Cal.4th at pp. 685-686.) *Sanchez* understood that in the latter scenario, the jury would have less information with which to assess the reliability of the expert's opinions, but the court determined that circumstance was a necessary consequence of protecting the defendant's constitutional right to confront his accusers. (*Id*. at p. 686.)

*Retroactivity Analysis*

The Attorney General, attorney for respondent, concedes a *Sanchez* violation occurred in this case. To his credit, he admits that gang expert Yepes recited to the jury case-specific testimonial hearsay from police documents in forming his opinions about petitioner's gang status, and because the sources of that hearsay were not shown to be unavailable, the trial court's instruction regarding the limited use of that evidence was insufficient to protect petitioner's Sixth Amendment rights. However, the Attorney

15

General contends that under the state and federal rules governing the retroactive application of new judicial opinions, *Sanchez* is not applicable in this collateral proceeding. We agree.

### 1. Federal Standard for Retroactivity of Judicial Opinions

#### (a) Overview of federal law and petitioner's position

The current guidelines for determining retroactivity under federal law were developed by the United States Supreme Court in *Teague v. Lane* (1989) 489 U.S. 288 (*Teague*). Under *Teague*, judicial decisions that create a new rule of law are generally not given retroactive effect to cases on collateral review that were already final when the rule was announced. (*Id*. at pp. 303-310.) While *Teague* recognized two exceptions to this rule, it made clear those exceptions are narrow because the government has a strong interest in ensuring judgments become *and remain* final. In that regard, the court emphasized that without finality "the criminal law is deprived of much of its deterrent effect" and the state is continually forced "to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." (*Id*. at pp. 309-310.)

The first *Teague* exception applies if the new rule is substantive in nature, meaning "it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe[.]' [Citation.]" (*Teague, supra*, 489 U.S. at p. 311.) The second exception comes into play when the new rule establishes a "watershed" rule of procedure that implicates the fundamental fairness and accuracy of criminal trials. (*Id*. at pp. 311-313; accord, *Montgomery v. Louisiana* (2016) __ U.S. __, __, 136 S.Ct. 718, 728; *Schriro v. Summerlin* (2004) 542 U.S. 348, 351.)

Petitioner admits the rule established in *Sanchez* pertaining to expert basis evidence is procedural and thus outside the scope of *Teague*'s first exception. While arguing *Teague* applies here, petitioner also acknowledges *Teague*'s second exception for watershed rules is rarely satisfied. Indeed, the United States Supreme Court has observed

16

that any rule qualifying for retroactive application under *Teague*'s second exception would have to be so central to an accurate determination of guilt or innocence "'it is unlikely any [such rule] "ha[s] yet to emerge."'" [Citation.]" (*Schriro v. Summerlin, supra,* 542 U.S. at p. 352; *Teague, supra,* 489 U.S. at p. 313; *Beard v. Banks* (2004) 542 U.S. 406, 417.) That is a significant hurdle for petitioner to overcome.

### (b) Does Sanchez constitute a new rule of criminal procedure?

Before analyzing the applicability of *Teague*'s second exception in this case, there is a threshold question we must address: We must determine whether the rule announced in *Sanchez* is actually "new." Rules that are not new generally apply to cases on collateral review whereas rules that are new must meet one of the two exceptions set forth in *Teague*. (*Whorton v. Bockting* (2007) 549 U.S. 406, 416.) Because those exceptions are so limited, the question of whether a rule is new is often dispositive of the retroactivity issue.

It is not as easy as it might seem to ascertain when a case announces a new rule for purposes of retroactivity. (*Teague, supra,* 489 U.S. at p. 301.) *Teague* explained that a case does so if its result was "not *dictated* by precedent existing at the time the defendant's conviction became final. [Citation.]" (*Ibid.*) A case is not dictated by existing precedent if its outcome was "susceptible to debate among reasonable minds." (*Butler v. McKellar* (1990) 494 U.S. 407, 415.) Therefore, "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt *compelled* by existing precedent'" to apply the rule in question, the rule will be considered new and presumed not to apply on collateral review. (*Graham v. Collins* (1993) 506 U.S. 461, 468, italics added, quoting *Saffle v. Parks* (1990) 494 U.S. 484, 488.) This standard preserves the principle of finality by "'validat[ing] reasonable, good-faith interpretations of existing precedents made by state courts' . . . even if those good-faith interpretations 'are shown to be contrary to later decisions.'" (*Ibid.*)

17

As petitioner correctly notes, by the time his case became final in 2015, *Crawford*, *Williams* and *Dungo* were already in the books. Thus, if those cases dictated the rule announced in *Sanchez* – that expert basis evidence is generally admitted for the truth of the matter asserted therein, and therefore subject to the hearsay rule and confrontation clause – then the rule was not new for retroactivity purposes, and petitioner would be entitled to have it applied in this proceeding. Petitioner argues *Crawford* and its progeny did dictate the *Sanchez* rule, even though the California Supreme Court had previously endorsed a contrary rule in *Montiel* and *Gardeley*. The way he sees it, *Sanchez* merely "distinguished" and "reconciled" those prior decisions with *Crawford* and its progeny, and therefore *Sanchez* did not establish a rule of law that was actually new. That is not our interpretation of the historical record.

*Sanchez* did not just tweak the law, as petitioner suggests. "In vigorously rejecting the not-admitted-for-its-truth rationale, the Supreme Court . . . dealt a death blow to the notion that juries can make any sense of the distinction traditionally espoused in cases such as *Gardeley*." (*People v. Stamps* (2016) 3 Cal.App.5th 988, 994-995, fn. omitted.) Indeed, *Sanchez* marked a "paradigm shift" in the proper use of expert basis evidence by abandoning the idea "that a limiting instruction intended to restrict jurors' consideration of such evidence to the purpose of serving as the basis for the expert's opinion" was a permissible method of avoiding hearsay problems. (*Id.* at p. 995.)

Any question as to whether this shift marked a major change in California jurisprudence was laid to rest when *Sanchez* expressly disapproved of the *Montiel/Gardeley* line of cases that had employed the old, not-admitted-for-its-truth rationale in dealing with expert basis evidence. (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) This alone is strong evidence *Sanchez* created a new rule for retroactivity purposes. (See *Whorton v. Bockting, supra,* 549 U.S. at p. 416 [by overruling *Roberts*, *Crawford* signaled it was breaking with past precedent and announcing a new rule of law].)

18

In arguing *Crawford* and its progeny dictated *Sanchez*'s result, petitioner overestimates the effect those cases had on the *Sanchez* decision. They may have laid the groundwork for *Sanchez*, but *Crawford* did not deal with the issue of expert basis evidence; rather, it focused more broadly on the constitutional standard governing the admissibility of hearsay evidence. *Williams* did involve expert basis evidence. However, as explained above, the justices in that case were sharply divided on the question of whether such evidence is admitted for its substantive truth, which was the core issue in *Sanchez*. The fact five of the justices (the four dissenters and one concurring justice) answered that question in the affirmative does not mean their view became the prevailing law of the land. To the contrary, because the case was ultimately decided on other grounds, their view has no precedential value in the traditional sense of the term. (See *Seminole Tribe v. Florida* (1996) 517 U.S. 44, 67 [the precedential scope of a United States Supreme Court decision extends only to the result in that case and those portions of the decision that are necessary to that result]; *Bailey v. United States* (D. Alaska 1962) 201 F.Supp. 604, 605 ["dissenting opinions, however logical they appear to be, are not the law of the case"].)

A careful reading of *Sanchez* indicates the California Supreme Court was fully aware of this when it decided that case. While the court found the reasoning of the five justice majority in *Williams* to be "persuasive" (*Sanchez, supra*, 63 Cal.4th at p. 684), it never suggested their reasoning *dictated* the outcome in *Sanchez*. Instead, the court took it upon itself to analyze the issue of expert basis evidence and formulate its own decision on that issue. In so doing, the court fulfilled its constitutional obligation to *independently* rule on questions that come before it. (See *People v. Lopez* (2012) 55 Cal.4th 569, 593-594 (dis. opn. of Liu, J.) ["As a court tasked with applying an evolving line of jurisprudence, our role is not simply to determine what outcome will likely garner five votes on the high court. Our job is to render the best interpretation of the law in light of the legal texts and authorities binding on us."].) And even though *Sanchez*'s ultimate

decision on that issue realigned California with the traditional common law rule regarding expert basis evidence, most jurists would probably consider the *Sanchez* decision quite novel, considering how the law in that area had evolved over the years. (*People v. Stamps, supra,* 3 Cal.App.5th at p. 995.)  At the very least, the outcome in *Sanchez* was sufficiently uncertain as to foreclose the label of foregone conclusion.

In arguing otherwise, petitioner relies on *People v. Perez* (2018) 22 Cal.App.5th 201 (*Perez*).  The *Perez* court considered whether the defendant had forfeited his right to invoke the *Sanchez* decision on appeal by failing to object at trial to a gang expert's testimony that consisted of case-specific hearsay.  Because Perez's trial preceded *Sanchez*, the forfeiture issue turned on whether *Sanchez* constituted an unforeseeable change in the law so as to excuse defense counsel's failure to object.  Given that *Crawford*, *Williams* and *Dungo* had already been decided by the time the defendant's trial took place, *Perez* determined it would not have been "futile" for defense counsel to object because those cases "indicated" an expert witness' reliance on hearsay was objectionable.  (*Id*. at pp. 212, 201.)  Therefore, the forfeiture rule applied, and the defendant was barred from challenging the expert's testimony on appeal.  (*Id*. at p. 212.)

But to say *Crawford* and its progeny foreshadowed the result in *Sanchez* for purposes of defeating the futility exception to the waiver requirement is not the same as saying those decisions *dictated* the result in *Sanchez* for purposes of determining whether it announced a new rule of law under *Teague*.  While those decisions clearly provided the impetus for our supreme court to revisit the rules regarding the permissible basis for expert testimony, they did not compel the court's ultimate decision to reconfigure the analytical framework respecting such testimony.  And, in fact, as several courts have recognized, objecting to expert basis evidence before *Sanchez* was decided would have been a pointless exercise because California Supreme Court precedent (i.e., *Montiel* and *Gardeley*) had firmly established such evidence does not implicate the hearsay rule. (See, e.g., *People v. Flint* (2018) 22 Cal.App.5th 983, __, fn. 12; *People v. Jeffrey G.*

20

(2017) 13 Cal.App.5th 501, 511; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1170, fn. 7, rev. granted Mar. 22, 2017, S239442.) Thus, to the extent *Perez* is applicable to the issue before us we respectfully decline to adopt its reasoning.

In any event, there is simply no denying the *Sanchez* decision has required every prosecutor, defense attorney and judge in this state to rethink their approach to expert basis evidence. Notwithstanding *Crawford* and its progeny, we hold a decent respect for the language and *Teague*'s definition of the word "new" requires the conclusion *Sanchez* announced a new rule of law under the federal rubric for assessing the retroactivity of judicial decisions.[7]

### (c) Does Sanchez come within the watershed exception?

That brings us to the question whether the *Sanchez* rule constitutes a watershed rule of criminal procedure so as to fit within the second exception to the presumption against retroactivity set forth in *Teague*. Our analysis of that issue is informed by *Whorton v. Bockting, supra*, 549 U.S. 406, in which the United States Supreme Court held its decision in *Crawford* does not apply retroactively to cases that were already final at the time *Crawford* was decided. In so holding, *Bockting* explained, "In order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent 'an "'impermissibly large risk'"' of an inaccurate conviction. [Citations.] Second, the rule must 'alter our understanding of the bedrock procedural elements essential to the fairness of the proceeding.' [Citation.]" (*Id.* at p. 418.)

To illustrate just how difficult it is for a case to obtain watershed status, *Bockting* used *Gideon v. Wainwright* (1963) 372 U.S. 335 (*Gideon*), the landmark decision granting indigent defendants the right to court-appointed counsel, as the

---

[7] Because *Sanchez* made new law by bringing expert basis evidence within the scope of the hearsay rule and the confrontation clause petitioner's failure to challenge Yepes' testimony on direct appeal is not a procedural bar to his doing so in this habeas proceeding. (*In re King* (1970) 3 Cal.3d 226, 229, fn. 2.)

21

touchstone for its analysis. (*Whorton v. Bockting, supra*, 549 U.S. at p. 419.) Finding "[t]he *Crawford* rule is in no way comparable to the *Gideon* rule" (*ibid.*), *Bockting* noted *Crawford* may enhance the accuracy of factfinding in some cases by subjecting testimonial hearsay to a more rigorous standard of admissibility than previously existed under *Roberts*. (*Ibid.*) But with respect to hearsay statements that are nontestimonial, *Crawford* actually "permits their admission even if they lack indicia of reliability." (*Id.* at p. 420.) Given that *Crawford* cuts both ways on the issue of reliability, *Bockting* found it was "unclear" whether *Crawford*'s implementation would seriously diminish the likelihood of a wrongful conviction in future cases. (*Ibid.*) Therefore, it concluded *Crawford* did not meet the first requirement for a watershed rule. (*Ibid.*)

*Bockting* also found *Crawford* lacking in terms of its constitutional magnitude. While recognizing the Sixth Amendment right of confrontation is a fundamental component of due process, *Bockting* clarified it is not enough that the rule in question pertains to a core constitutional right. Instead, the rule "must *itself* constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding." (*Whorton v. Bockting, supra*, 549 U.S. at p. 421, italics added.) Again, using *Gideon* as a benchmark, *Bockting* determined *Crawford* came up short in this regard because, "while certainly important," *Crawford* "lacks the 'primacy' and 'centrality' of the *Gideon* rule," which "effected a profound and ""sweeping"" change to the criminal justice system. (*Ibid.*) Thus, *Bockting* held *Crawford* "does not fall within the *Teague* exception for watershed rules." (*Ibid.*; see also *In re Moore* (2005) 133 Cal.App.4th 68 [ruling similarly].)

Given this guidance, we cannot see how the *Sanchez* decision could qualify as a watershed rule. After all, *Sanchez* is but an extension of *Crawford*; it merely considered *the degree* to which *Crawford* applies in the context of expert testimony. (*Sanchez, supra*, 63 Cal.4th at p. 670.) And as it turned out, *Sanchez* actually limited the scope of *Crawford* in that context. Whereas *Crawford* applies broadly to all testimonial

22

hearsay, *Sanchez*'s reach extends only to testimonial hearsay that is case-specific to the matter at hand. Thus, overall, *Sanchez* is – for purposes of a *Teague* analysis – less likely than *Crawford* to increase the accuracy of the factfinding process.

That's not to say the *Sanchez* rule is not significant. To the contrary, its importance is obvious. As we have noted, it requires rethinking a large body of evidence precedent in our state. But compared to the landmark ruling in *Gideon*, which fundamentally altered the playing field in criminal proceedings, *Sanchez* is far less likely to have an impact on the fairness and accuracy of criminal trials. We thus conclude *Sanchez* did not establish a watershed rule of criminal procedure under *Teague*. And because, as petitioner concedes, *Sanchez* does not meet *Teague*'s exception for substantive rules, it does not qualify for retroactive application under federal law.

*2. Retroactivity under California Law*

But our finding that *Sanchez* is ineligible for retroactive application under *Teague* is not dispositive of petitioner's claim. California is free to adopt its own standard and rules regarding the retroactivity of new judicial opinions. (*In re Gomez* (2009) 45 Cal.4th 650, 655, fn. 3.) This freedom stems from the recognition that states are "independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on federal constitutional guarantees." (*Danforth v. Minnesota* (2008) 552 U.S. 264, 280.)

*(a) New rule analysis*

As under federal law, the threshold question in determining the retroactivity of a judicial decision under *state law* is whether the decision established a new rule. "If it does, the new rule may or may not be retroactive, as we discuss below; but if it does not, 'no question of retroactivity arises' because there is no material change in the law. [Citations.]" (*People v. Guerra* (1984) 37 Cal.3d 385, 399.) A decision of the California Supreme Court establishes a new rule of law if it expressly overrules a precedent of that court or disapproves a practice it had impliedly sanctioned in an earlier case. (*Id.* at p.

401; *In re Lucero* (2011) 200 Cal.App.4th 38, 45.) While *Sanchez* did not overrule *Gardeley* in so many words, it did "disapprove" of that decision "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) By renouncing this practice, *Sanchez* created a new rule for purposes of state retroactivity analysis. We must now deal with whether that rule must be retroactively applied under state law.

### *(b) State standard for retroactivity*

Although states are free to establish their own rules for determining the retroactivity of judicial opinions, California courts have generally hewed to the federal standard. (See, e.g., *In re Gomez, supra*, 45 Cal.4th 650; *In re Moore, supra,* 133 Cal.App.4th at pp. 74-77.) We have already explained why *Sanchez* does not qualify for retroactive application under the current federal standard articulated in *Teague*. However, prior to *Teague*, the federal standard was more forgiving, so in this case, petitioner invokes the old federal standard as a separate analytical basis for his retroactivity claim. Although that standard is outdated for purposes of federal law, the Attorney General admits it still has potential application in deciding the retroactivity of California Supreme Court decisions. (See, e.g., *In re Lucero, supra,* 200 Cal.App.4th at p. 45 [applying the old federal standard to determine whether the rule created in *People v. Chun* (2009) 45 Cal.4th 1172 should be given retroactive effect].) Therefore, out of an abundance of caution, we will engage in an analysis of the *Sanchez* decision under that standard.

Applying that standard, the retroactivity analysis is informed by three factors: 1) The purpose of the new rule, 2) the reliance placed on the old rule, and 3) the effect retroactive application would have on the administration of justice. (*Stovall v. Denno* (1967) 388 U.S. 293, 297; *Linkletter v. Walker* (1965) 381 U.S. 618, 629.) However, the first factor is of primary importance and will generally be deemed

24

controlling if the purpose of the new rule plainly favors retroactive or prospective application. (*In re Johnson* (1970) 3 Cal.3d 404, 410.) In this context, the purpose of a new rule is determined by examining its relationship to the reliability and integrity of the fact-finding process at trial. (*Id*. at pp. 411, 416.) "[T]he more directly the [rule] serves to preclude the conviction of innocent persons, the more likely it is that the rule we be afforded retrospective application." (*Id*. at p. 413.)

In assessing its likely impact on criminal trials, it is important to remember *Sanchez* did not create a substantive rule of law or a watershed rule of criminal procedure. It simply established an evidentiary framework for analyzing the admissibility of expert basis evidence. As we have explained, the chief takeaway from *Sanchez* is that expert witnesses may no longer recite case-specific testimonial hearsay to the jury in explaining the foundation for their opinions, absent a showing of unavailability and a prior opportunity for cross-examination. That means a prosecutor will have two choices when those criteria are not met. The first option will be to call the hearsay declarant as a witness to supply the evidentiary foundation for the expert's opinions. In that situation, the reliability of the fact-finding process will be enhanced because the declarant will be available for cross-examination.

Alternatively, the prosecutor can simply instruct his expert witness to describe the hearsay information he relied on in general terms without divulging its contents to the jury. (See *Sanchez, supra*, 63 Cal.4th at pp. 685-686.) Doing so would prevent jurors from being exposed to inadmissible and potentially prejudicial hearsay, but it would also deprive them of information with which to assess the expert's opinions. (*Id*. at p. 686.) So, in some cases, complying with *Sanchez* could be seen as *decreasing* the reliability of the jury's verdict.[8]

---

[8] While this is counter-intuitive, the criminal law includes many rules – such as the exclusionary rule and California's Evidence Code section 352 – which result in jury's getting a fairer but less complete set of facts.

25

In that sense, *Sanchez* is similar to *Crawford* in that there is no guarantee it will seriously diminish the likelihood of an inaccurate conviction. Neither decision is so fundamental to the reliability of the fact-finding process that it is necessary to ensure the acquittal of innocent persons. And because *Sanchez* only pertains to a particular subset of testimony – that derived from expert witnesses – its impact on the accuracy of criminal trials is likely to be less far-reaching than *Crawford*. Because *Sanchez* is not central to the integrity of the truth-determining process, the purpose factor does not favor giving it retroactive effect.

Nor do the remaining factors – the extent of reliance on the old rule and the administrative effect of retroactivity. Prior to *Sanchez*, prosecutors in California had relied on the *Montiel/Gardeley* line of cases for over two decades. That reliance was justified by the fact *Montiel* and *Gardeley* were controlling Supreme Court precedent on the issue of expert basis evidence. (*Sanchez, supra*, 63 Cal.4th at pp. 679, 683.) And not only was past reliance on that precedent reasonable, it was also widespread in cases like the one at hand.[9] It cannot be gainsaid that it would be exceedingly disruptive and costly to retry the many thousands of cases that were adjudicated under the old framework. Considering the purpose of the *Sanchez* rule, the extent to which prosecutors justifiably relied on the old rule, and the tremendous administrative burden associated with a contrary ruling, we do not believe *Sanchez* qualifies for retroactive application under the California standard, i.e., the old federal standard.

In arguing otherwise, petitioner draws our attention to two per curiam decisions of the United States Supreme Court that were adjudicated under the old federal standard, *Roberts v. Russell* (1968) 392 U.S. 293 (*Roberts*) and *Berger v. California* (1969) 393 U.S. 314 (*Berger*). At issue in *Roberts* was the retroactivity of *Bruton v. United States* (1968) 391 U.S. 123, which found a confrontation clause violation in the

---

[9] According to Westlaw's computerized database, *Gardeley* alone was cited in over 2,000 appellate decisions between the time it was decided in 1996 and the time *Sanchez* was decided in 2016.

26

admission of a nontestifying defendant's confession that implicated his codefendant. *Roberts* determined that because the admission of such confessions create "a serious risk that the issue of guilt or innocence may not have been reliably determined," *Bruton* must be given retroactive effect. (*Roberts, supra*, 392 U.S. at p. 295.)

Likewise in *Berger*, the court gave retroactive effect to *Barber v. Page* (1968) 390 U.S. 719, which ruled the confrontation clause prohibits the introduction of a witness' preliminary hearing testimony unless the prosecution has made a good faith effort to secure the witness' presence at trial. *Berger* reasoned retroactive application of *Barber* was warranted because it corrected an error that significantly impaired "the 'integrity of the fact-finding process.' [Citations.]" (*Berger, supra*, 393 U.S. at p. 315; see also *In re Montgomery* (1970) 2 Cal.3d 863 [ruling similarly].)

The key distinguishing feature of *Roberts* and *Berger* is that they addressed the retroactivity of rules that were designed to remedy the situation that existed when the defendant did not have *any* opportunity to cross-examine the subject witness at trial. (*Roberts, supra*, 392 U.S. at p. 293 [complete inability to cross-examine codefendant]; *Berger, supra*, 393 U.S. at p. 314 [complete inability to cross-examine victim].) That is not our case. Petitioner here *was* permitted to cross-examine gang expert Yepes at his trial. By exposing the shortcomings of Yepes' testimony, he provided the jury with valuable information with which to assess the reliability of his opinions.

Petitioner is correct that his ability to cross-examine Yepes was not wholly unfettered. Because Yepes lacked personal knowledge of the hearsay evidence on which he relied, he was in no position to answer questions about that evidence. If that evidence consisted of opinions from other people that Yepes simply parroted to the jury, petitioner would have greater cause to complain. However, Yepes did not act as a mere conduit for the opinion of others. Instead, he used the hearsay evidence to form his *own* opinions about the case. In so doing, Yepes created an "'original product'" of substantive evidence that could be "'tested through cross-examination.' [Citation.]" (*United States*

27

*v. Summers* (4th Cir. 2011) 666 F.3d 192, 202.) This provided petitioner with a meaningful opportunity for cross-examination. (*Ibid*.; *State v. Stanfield* (Idaho 2015) 347 P.3d 175, 186-187, fn. 6 [collecting cases that have drawn a distinction between an expert witness using hearsay evidence to arrive at an independent opinion and an expert witness using hearsay evidence simply to convey the opinion of others].) Because the defendants in *Roberts* and *Berger* did not have such an opportunity, let alone *any* chance to cross-examine the subject witnesses at trial, we find those cases inapt.[10]

In light of all the pertinent considerations, we conclude *Sanchez* is not retroactive to cases on collateral review. Therefore, petitioner cannot avail himself of that decision in this proceeding.

## DISPOSITION

The petition for a writ of habeas corpus is denied.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

---

[10] Petitioner also relies on *People v. Guerra, supra,* 37 Cal.3d 385, which gave retroactive effect to a rule barring the use of testimony from persons who have been hypnotized to restore their memory. However, that decision arose in the context of a direct appeal, which is more favorable to a finding of retroactivity. Attuned to this fact, the Supreme Court specifically declined to consider whether the hypnosis rule "applies on collateral attack to cases now final." (*Id*. at p. 413, fn. 24.)