Filed 7/14/20; Modified and Certified for Publication 8/10/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>         v.<br><br>IGNACIO OGAZ,<br><br>    Defendant and Appellant. | G055726<br><br>(Super. Ct. No. 17CF0843)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Reversed.

Elisabeth A. Bowman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine Gutierrez and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Ignacio Ogaz appeals from a judgment sentencing him to prison for illegal drug activity. He contends his Sixth Amendment right to confront adverse witnesses was violated by the admission of certain drug testing evidence, and we agree. Because appellant did not have the opportunity to cross-examine the analyst who conducted the drug testing, we reverse the judgment.

FACTS

On the morning of April 4, 2017, Police Officer Collin Reedy contacted appellant at the Civic Center Plaza in Santa Ana. At that time, the plaza had a large homeless population, and appellant was standing next to a tent that contained his belongings. Reedy searched appellant and found a large baggie in his pocket. That baggie contained two smaller baggies, one of which contained a brown powder that looked and smelled like heroin, and one of which contained a white crystal substance that had the appearance of methamphetamine. Reedy also found 80-some dollars and two cell phones on appellant, who was sleepy and lethargic. A search of appellant's tent turned up another baggie of white crystals, a digital scale and a dozen or so unused hypodermic needles.

After arresting appellant, Reedy weighed the powder and crystals and determined they had a combined weight of 10.5 grams. He also tested them using a presumptive testing kit. The powder tested positive for heroin, and the crystals from the other two baggies tested positive for methamphetamine. Those results were later confirmed by the Orange County Crime Lab (OCCL or the lab). The OCCL also recovered numerous text messages from appellant's phones. In some of the messages, appellant advised the recipient not to come around the plaza when the police were there.

At trial, the only disputed issue was whether appellant possessed the drugs found in his possession to sell them. Given all the circumstances presented, Reedy opined he did, and the jury agreed. It convicted appellant of one count each of possessing

2

heroin and methamphetamine for sale. After finding appellant had suffered four prior drug convictions, the trial court sentenced him to 68 months in prison.

DISCUSSION

Appellant contends the trial court erred in admitting evidence regarding the OCCL's drug testing results, absent testimony from the person who actually conducted the testing. In appellant's view, this prejudicially violated his confrontation rights under the Sixth Amendment. We agree.

The drug testing in this case was conducted by Michelle Stevens, a forensic scientist in the controlled substances division of the OCCL. In conjunction with her testing, Stevens prepared a one-page report that was admitted into evidence over appellant's objection as People's Exhibit No. 12. The report states the substances Stevens examined were submitted to the lab from the Santa Ana Police Department (SAPD). It identifies appellant as the person from whom those substances were recovered, and it contains the case number the SAPD assigned to this particular matter. That case number also appears on the felony complaint that was filed against appellant on April 5, 2017, the day after he was arrested and taken into custody.

The main section of Stevens' report is entitled, "ANALYTICAL RESULTS AND INTERPRETATIONS." It states the brown substance Officer Reedy recovered from appellant had a net weight of 8.463 grams and contained heroin. And the other two substances Reedy seized, described as being off-white and weighing 284 and 249 milligrams respectively, contained methamphetamine.

Near the bottom of the report, Stevens signed her name in an area identifying her as the analyst who conducted the testing. Underneath her signature are the initials of Thomas Dickan, who, as Stevens' supervisor, reviewed the report on May 5, 2017, the day after it was prepared. The report also contains the initials of a third person who processed the report for administrative purposes by logging it into the lab's information management system.

At trial, Stevens did not testify. Rather it was Dickan who took the stand to talk about the report and its contents. Dickan testified he has been a forensic scientist at the OCCL for 27 years and currently heads up the controlled substances unit of the lab. He also said the lab is accredited and that he trained Stevens on how to analyze controlled substances.

Speaking to the lab's testing procedures, Dickan explained that every substance analyzed there is subjected to two independent tests. To detect heroin, the analysts use the gas chromatograph mass spectrometry (GCMS) test and the gas chromatograph infrared test. And to detect methamphetamine, they use the GCMS test and the microcrystal test. Dickan testified he has conducted those tests thousands of times during his career. His testimony also made it clear the tests involve an element of subjective interpretation.

For the microcrystal test, Dickan said, the analyst mixes the substance being tested with a reagent and examines it under a microscope to see if it possesses "crystals that are characteristic of methamphetamine." For the mass spectrometry test, the substance is exposed to a high energy electron beam that produces fragments that are analyzed like "a fingerprint" to determine if a controlled substance is present. And with the infrared test, exposure to an infrared light produces "peaks and valleys" the analyst examines and compares to known standards.

Dickan admitted he did not participate in or observe the testing Stevens performed in this case and had no independent recollection of the substances she examined. However, he did review her report and the notes and data she generated. In so doing, Dickan was "checking for technical correctness" and to make sure "the appropriate work was done." He could tell she employed the tests he described in his testimony. And by initialing the report, he was signifying he agreed with the results she obtained, which he recited to the jury. He did not detect "anything out of sorts" regarding packaging or tampering, nor did he have any concerns about the validity of those results.

4

Appellant contends the admission of the drug testing evidence – Stevens' report and Dickan's testimony regarding it – violated his right "to be confronted with the witnesses against him" under the Sixth Amendment to the United States Constitution. As interpreted by the Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the Sixth Amendment's confrontation clause prohibits the admission of "testimonial statements" made by a nontestifying witness unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination. (*Id*. at p. 59.) Here, it is undisputed that neither unavailability nor prior cross-examination were established with respect to Stevens. Therefore, the admissibility of her report turns on whether it was testimonial.

In *Crawford*, the Supreme Court did not provide a comprehensive definition of the term testimonial. However, in discussing the parameters of that term, the court observed the formality of a statement and the setting in which it was made are important factors bearing on whether it will be deemed testimonial. In that regard, the court observed, "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford, supra*, 541 U.S. at p. 51.) The court made it clear that the reason the statement was made is also a relevant consideration and that a statement is more likely to be testimonial if it was made for the purpose of establishing some fact for later use at trial. (*Id*. at pp. 51-52.)

With those considerations in mind, the Supreme Court went on to say that prior testimony and statements obtained in the course of police interrogations would qualify as testimonial. (*Crawford, supra*, 541 U.S. at p. 52, 68.) Indeed, on the facts before it, the *Crawford* court specifically held that tape-recorded statements made by the defendant's wife in the course of a formal police interview were testimonial. (*Id*. at pp. 65-69.) The court also indicated that statements contained in formalized materials such

as affidavits would fit within the core class of testimonial statements with which the confrontation clause is concerned. (*Id*. at pp. 51-52.)

Since its decision in *Crawford*, the United States Supreme Court has ruled on three cases involving the admissibility of evidence contained in forensic lab reports, *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), *Bullcoming v. New Mexico* (2011) 564 U.S. 647 (*Bullcoming*) and *Williams v. Illinois* (2012) 567 U.S. 50 (*Williams*). These decisions provide the backdrop for our analysis of the drug testing evidence that was admitted in this case.

In *Melendez-Diaz,* the prosecution introduced formal "'certificates of analysis'" to prove the substances seized from the defendant contained cocaine. (*Melendez-Diaz, supra,* 557 U.S. at p. 308.) The certificates, which showed the results of forensic analysis performed on the substances, were sworn before a notary public, as required under Massachusetts law. The defendant argued that made the results testimonial, and the Supreme Court agreed. It reasoned, "The documents at issue here, while denominated by Massachusetts law 'certificates,' are quite plainly affidavits: 'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.' [Citation.] They are incontrovertibly a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" [Citations.] The fact in question is that the substance found in the possession of [the defendant] . . . was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial. The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation.]" (*Id*. at pp. 310-311.) Because the certificates qualified as testimonial documents, the Supreme Court determined their admission into evidence violated the Sixth Amendment because the defendant never had a chance to confront the analysts who prepared them. (*Id*. at p. 311.)

The Supreme Court reached a similar conclusion in *Bullcoming*. There, the principal evidence against the defendant was a forensic lab report certifying his blood-alcohol level was above that required for aggravated DWI in New Mexico. However, during the trial, the prosecution did not call the analyst who tested the defendant's blood and signed the report. Instead, it introduced the testing results through an analyst who had reviewed the report but did not certify its contents or have anything to do with the testing process. Although the report was unsworn, the Supreme Court found it was similar to the report at issue in *Melendez-Diaz* in "all material respects," in that it consisted of a formalized signed document, it contained the certified results of the testing conducted, and it was produced to assist a police investigation by proving a fact for later use at trial. (*Bullcoming, supra*, 564 U.S. at pp. 664-665.) Thus, the report qualified as a testimonial document, and it was impermissible under the Sixth Amendment for the state to introduce its contents through a surrogate who played no role in its preparation. (*Id*. at p. 665.)

The *Williams* decision came down one year later, in 2012. In that case, a forensic expert for the prosecution relied on a DNA report containing the laboratory analysis of semen that was found inside a rape victim. Although the report was not introduced into evidence, and the expert did not reveal its contents in her testimony, she relied on it in concluding the DNA profile the lab derived from the semen matched the DNA profile of the defendant. The problem was, the expert lacked personal knowledge about how the report was made, so the defendant was unable to cross-examine her as to that issue. The question before the high court was whether this procedure violated the defendant's right to confront the people who contributed to the making of the report. (*Williams, supra,* 567 U.S. at pp. 59-64.)

In his plurality opinion, Justice Alito (joined by Chief Justice Roberts, Justice Kennedy and Justice Breyer) answered that question in the negative. These four justices believed the expert's reliance on the Cellmark report was constitutionally

7

permissible for two reasons.  First, the expert used the report as a foundation for her opinions, not for its substantive truth, and therefore the report was not hearsay. (*Williams, supra,* 567 U.S. at pp. 67-81.)  Second, the defendant was not a suspect at the time the report was generated.  The plurality believed this circumstance rendered the report nontestimonial because, although the report was prepared for use at trial, it "was not prepared for the primary purpose of accusing a targeted individual."  (*Id*. at p. 84.)

Writing in dissent, Justice Kagan (joined by Justices Scalia, Ginsburg and Sotomayor) disagreed with both of these conclusions.  (*Williams, supra,* 567 U.S. at pp. 125-138 (dis. opn. of Kagan, J.).)  Thus, the fate of the defendant's appeal rested in the hands of Justice Thomas.  Like the four dissenting justices, Justice Thomas rejected both of the rationales put forth by Justice Alito in his plurality opinion.  (*Id*. at pp. 102-110, 113-118 (conc. opn. of Thomas, J.)  However, Justice Thomas concurred with the plurality that the Cellmark report was not testimonial, thereby providing the fifth vote in favor of affirming the defendant's conviction.

In reaching this conclusion, Justice Thomas was not concerned with the purpose of the report; rather, he believed the report was nontestimonial "solely because [it] lacked the requisite 'formaility and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause.  [Citation.]"  (*Williams, supra,* 567 U.S. at pp. 103-104 (conc. opn. of Thomas, J.).)  Contrasting the Cellmark report with the ones at issue in *Melendez-Diaz* and *Bullcoming*, Justice Thomas emphasized the report was "neither a sworn nor a certified declaration of fact.  Nowhere does [it] attest that its statements accurately reflect the DNA testing processes used or the results obtained. [Citation.]  The report is signed by two 'reviewers,' but they neither purport to have performed the DNA testing nor certify the accuracy of those who did.  [Citation.]."  (*Id*. at p. 111 (conc. opn. of Thomas, J.).)  According to Justice Thomas, these characteristics may have lessened the report's reliability, but they did not prevent the prosecution's expert witness from relying on it to form her opinions because it did not come within the

8

"narrow class of statements bearing indicia of solemnity" to which the confrontation clause was intended to apply. (*Id*. at pp. 112-113, 118.)

No other justice signed on to Justice Thomas' concurrence. As noted above, the four justices in the plurality utilized different rationale in finding the Cellmark report was nontestimonial. And the four justices in the dissent expressly disagreed with Justice Thomas' conclusion that the report lacked sufficient indicia of formality and solemnity to constitute a testimonial document. While acknowledging the Cellmark report was not sworn or certified, Justice Kagan argued it was substantively indistinguishable from the reports at issue in *Melendez-Diaz* and *Bullcoming*. In this regard, Justice Kagan stated that each of the three reports "is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more 'formal' than the other; neither *is* any more formal than the other. [Citation.]" (*Williams, supra*, 567 U.S. at p. 139 (dis. opn. of Kagan, J.).) Thus, to characterize the Cellmark report as nontestimonial would, in Justice Kagan's opinion, elevate form over substance and afford "constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections." (*Ibid*.)

In the wake of the United States Supreme Court's decision in *Williams*, the California Supreme Court addressed confrontation clause issues in two cases of note, *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*). These cases underscore the fact that formality and purpose are the key considerations in deciding whether a forensic report is testimonial.

In *Dungo*, the Supreme Court held statements contained in an autopsy report describing the anatomical and physiological condition of the victim's body were not testimonial. (*Dungo, supra*, 55 Cal.4th 608, 619.) The court reasoned, "These statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions [as to the cause of the victim's death]. They are comparable to observations of objective facts in a report by a physician who, after

9

examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment." (*Ibid*.) Such observations are "not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right[.]" (*Id*. at p. 621; accord, *People v. Holmes* (2012) 212 Cal.App.4th 431, 438 [statements in lab report that merely reflected objective facts were not testimonial].)

As an alternative basis for finding the autopsy report outside the scope of the confrontation clause, the *Dungo* court held the report was not made for the primary purpose of facilitating a criminal investigation. Even though that was one of reasons the report was prepared, the court observed the report was also relevant to other matters, such as civil litigation, insurance and satisfying the public's interest in knowing the cause of the victim's death. (*Dungo, supra*, 55 Cal.4th at p. 621.) Given that the report had several purposes unrelated to its prosecutorial function, the court held it did not rise to the level of a testimonial document. (*Id*. at pp. 620-621.)

In *Lopez*, the prosecution used a blood analysis report to prove the defendant was driving under the influence when she caused a fatal car crash. Despite the fact the technician who conducted the analysis and prepared the report was not shown to be unavailable, the Supreme Court ruled it was permissible for the trial court to admit his report into evidence and allow his supervisor to testify about its contents. (*Lopez, supra*, 55 Cal.4th at p. 585.)

In so ruling, the court stated that to qualify as testimonial, a forensic report must have "two critical components[.]" (*Lopez, supra*, 55 Cal.4th at p. 568.) First, the report "must have been made with some degree of formality or solemnity. [Citation.]" (*Id*. at p. 568.) And second, its primary purpose must "pertain[] in some fashion to a criminal prosecution[.]" (*Id*. at p. 569.) However, the court did not assess the primary purpose of the blood analysis report before it because it determined the report was not sufficiently formal or solemn to be considered testimonial.

10

With respect to the formality issue, the *Lopez* court found it significant that the bulk of the report consisted of machine generated data, as opposed to statements from the technician who conducted the testing. The court decided that "[b]ecause, unlike a person, a machine cannot be cross-examined, . . . the prosecution's introduction into evidence of the machine-generated printout . . . did not implicate the Sixth Amendment[.]" (*Lopez, supra*, 55 Cal.4th at p. 583.)

The report at issue in *Lopez* also contained a notation from a lab assistant linking the defendant's blood to a particular sample that was tested. That notation was set forth on the report's "'chain of custody log sheet,'" an administrative document that was initialed by the assistant and the analyst who conducted the testing. (*Lopez, supra*, 55 Cal.4th at pp. 582-583.) The court ruled this document was also outside the scope of the confrontation clause because, for one thing, neither the assistant nor the analyst "signed, certified, or swore to the truth of [its] contents[.]" (*Id*. at p. 584.) Moreover, the document showed "only numbers, abbreviations, and one-word entries under specified headings" and was labeled "'FOR LAB USE ONLY.'" (*Ibid*.) This demonstrated the document was "nothing more than an informal record of data for internal purposes," and was "not prepared with the formality required by the high court for testimonial statements." (*Ibid*.)

The Attorney General likens *Lopez* to the case at hand. However, the lab report at issue here is distinguishable from the lab report in *Lopez* in several respects. Most obviously, Stevens signed the report, thereby attesting to its contents. While there is no formal certification or attestation included in the report, Stevens' signature demonstrates she was willing to stand behind the information reflected therein. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1168 [interpreting *Lopez* as drawing a distinction between the initialing of a report, which is too informal to make it testimonial, and the situation where the report is signed by its creator]; McGowan, *The Signing of Laboratory Reports* (1974) Journal of Clinical Pathology, vol. 27, p. 427 ["Laboratory

11

reports should be signed to indicate . . . that someone in the laboratory accepts a responsibility for the contents of the report."].) The presence of Stevens' signature also sets her report apart from the one at issue in *Williams*, which was signed by two reviewers, but not by the analysts who performed the testing in question.

Another distinguishing feature of Stevens' report is that it is not comprised primarily of machine generated data, as in *Lopez*, or objective facts, as in *Dungo*. Instead, the report contains the substantive conclusions Stevens reached as a result of the testing she conducted, which is precisely what she would have been expected to testify about had she appeared at trial. It cannot be gainsaid that her report served as the functional equivalent of live, in-court testimony. (See *People v. Cage* (2007) 40 Cal.4th 965, 984 [describing testimonial statements as "out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial"].)

Furthermore, unlike the chain of custody log sheet in *Lopez*, there is nothing in Stevens' report indicating it was intended for administrative purposes only. The report was initialed by an administrative assistant who entered it into the lab's internal data base. But the report obviously had broader implications and was designed for other purposes. That brings us to the second step in our analysis. Having determined the report possesses the requisite formality to constitute a testimonial document, we now turn our attention to the primary purpose factor.

The Attorney General sees the report as nothing more than a business record that was generated to facilitate the administration of the lab's affairs. He questions whether the report was primarily intended to be used as evidence in a criminal trial because it does not contain any information about the circumstances under which the substances in question were seized from appellant, nor does it refer to any criminal charges.

But the report does contain the case number assigned by the SAPD, which is identified as the submitting agency. That number also appears on the criminal

12

complaint that was pending against appellant at the time the report was generated. Stevens played an important role with respect to the charges set forth in that charging document. Acting as an investigative arm of the prosecution, her responsibility was to determine whether the substances seized from appellant contained contraband, so as to support the charges in the complaint. (See *In re Brown* (1998) 17 Cal.4th 873, 880-881 [county drug lab scientists who assist the government's case are part of the prosecution team].) And, at trial, her report was admitted to prove that they did. Considered as a whole, the circumstances surrounding the report's preparation convince us its primary purpose pertained to a criminal prosecution.

Based on the formal nature of the report and its forensic purpose, we conclude it qualifies as a testimonial document for purposes of the Sixth Amendment. (*Marshall v. People* (Col. 2013) 309 P.3d 943, 946 [lab report prepared to facilitate criminal prosecution was testimonial]; *Martin v. State* (Del. 2013) 60 A.3d 1100, 1106-1108 [same]; *State v. Laturner* (Kan. 2009) 218 P.3d 23, 26-29 [same]; *Whittle v. Commonwealth* (Ky. 2011) 352 S.W.3d 898, 901-904 [same]; *State v. March* (Mo. 2007) 216 S.W.3d 663, 665-667 [same]; *State v. Michaels* (N.J. 2014) 95 A.3d 648, 674-675 [same]; *State v. Aragon* (N.Mex. 2010) 225 P.3d 1280, 1287, overruled on other grounds in *State v. Tollardo* (N.Mex. 2012) 275 P.3d 110 [same]; *Thomas v. United States* (D.C.App. 2006) 914 A.2d 1, 12-13 [same]; *Burch v. State* (Tex.App. 2013) 401 S.W.3d 634, 639 [same].)

Nevertheless, the Attorney General argues no Sixth Amendment violation occurred because appellant had the opportunity to cross-examine Dickan at trial. Dickan was not personally involved in the testing Stevens conducted, nor did he have any personal knowledge of the substances she examined. However, the Attorney General contends that doesn't matter because Dickan was generally familiar with the testing processes Stevens employed, he reviewed her testing data, and he signed off on her report. According to the Attorney General, this rendered Dickan fully qualified to answer

13

any questions about Stevens' testing methods and the results she obtained, and therefore Stevens' absence from the trial did not violate appellant's confrontation rights.

This argument overlooks the fact the conclusions set forth in Stevens' report were based on her subjective impressions of the evidence she examined. In conducting the microcrystal test, Stevens had to determine whether the substances took on the appearance of methamphetamine crystals after being mixed with a particular reagent. And during the gas chromatograph tests, she had to determine whether subjecting the substances to an electron beam and infrared light produced effects that indicated the presence of heroin. These determinations required subjective analysis and comparison on Stevens' behalf. Dickan could not be effectively cross-examined as to what Stevens saw or how she interpreted the information her testing produced.

That wouldn't be a problem if Dickan had formulated his own independent opinions based on the data that Stevens produced during the testing process. But this is not a situation where an expert witness reviewed the work of another analyst and came to his or her own conclusion about the matter at hand. (Compare *Lopez, supra*, 55 Cal.4th at pp. 587 [conc. opn. of Werdegar, J.] ["The demands of the confrontation clause were properly satisfied in this case by calling a well-qualified expert witness to the stand . . . who could testify to the means by which the critical instrument-generated data was produced and could interpret those data for the jury, giving his own, independent opinion as to the level of alcohol in defendant's blood sample."]; *People v. Barba* (2013) 215 Cal.App.4th 712 [expert witness independently drew conclusions from test results obtained by another worker in her lab]; *People v. Steppe* (2013) 213 Cal.App.4th 1116 [lab's technical reviewer gave her own independent opinion based on testing performer by another technician]; *People v. Huynh* (2012) 212 Cal.App.4th 285 [medical expert witness formed her own independent opinions from photographs taken by coworker and did not relay the opinions of her coworker to the jury]; *People v. Holmes, supra,* 212

14

Cal.App.4th 431 [expert witnesses reached their own conclusions based on testing data generated by other analysts].)

In fact, Dickan never offered any of his own personal opinions regarding the substances at issue in this case. What he did was simply recite to the jury the results Stevens obtained in her testing. In other words, he was a "mere conduit" for Stevens' opinions. While an expert witness who forms his own opinions based on the reports of others creates an original product of substantive evidence that can be tested through cross-examination, that is not the case when, as here, the expert simply conveys the opinions of others. (*People v. Leon* (2015) 61 Cal.4th 569, 603; *In re Ruedas* (2018) 23 Cal.App.5th 777, 802.)

Dickan did review Stevens' testing for technical correctness and approve her report. But instead of analyzing the substances in questions and drawing his own conclusions about their compositional makeup, he merely reviewed the notes and data that Stevens generated in her testing analysis. There is nothing in the record to suggest that Dickan independently corroborated the results Stevens obtained or that he reached an independent opinion the substances contained a prohibited drug. Rather, the most he could say is that he saw nothing in Stevens' report to make him question the findings she made. In that respect, Dickan's opinions were conveyed only with reference to his agreement with Stevens; they were not derived from his own personal knowledge about the case.

In *Bullcoming*, *supra*, the United States Supreme Court rejected the idea that a witness who reviewed and certified certain lab testing was a suitable substitute at trial for the analyst who performed the actual testing. Even though the witness was an expert with respect to both the type of testing performed and the lab's procedures, the court found his testimony could not satisfy the Sixth Amendment because he "could not convey what [the analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." (*Bullcoming, supra*, 564 U.S. at

15

pp. 661-662.) In coming to this conclusion, the court also noted the reviewer apparently never formulated an independent opinion about the conclusions reached in the analyst's report. (*Id*. at p. 662.)

Likewise, here, Dickan lacked personal knowledge about the particular testing Stevens conducted, and he offered no independent opinion about the subject or her testimony. Since the reliability of his testimony was dependent on the reliability of Stevens' testing, about which he lacked personal knowledge, he was not a suitable substitute for Stevens at trial. (*Martin v. State, supra,* 60 A.3d at p. 1106 [admission of lab supervisor's report and testimony concerning the results of an incriminating blood test violated the defendant's confrontation rights because even though the supervisor certified those results she "neither participated in nor observed the test . . . . She only reviewed the data and conclusions of the chemist who actually performed the test."]; *People v. Lewis* (Ill.App. 2019) 127 N.E.3d 1127, 1135 [although firearms expert verified and agreed with findings appearing in gun examination report, he was not an adequate substitute witness for the person who conducted the examination, and therefore his testimony regarding the report violated the Sixth Amendment]; *Burch v. State, supra,* 401 S.W.3d at p. 637 [lab supervisor who signed drug report testified the lab's policies and procedures were followed, and she double-checked everything that was done. However, she did not participate in the testing process or witness it, and thus she did not have personal knowledge the testing was done correctly or the tester did not fabricate the results. Thus, making her available for cross-examination did not satisfy appellant's confrontation rights.].)

Beyond that, we must be mindful of a more fundamental aspect of the *Bullcoming* decision. Namely, the Sixth Amendment "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." (*Bullcoming, supra*, 564 U.S. at p. 662.) Instead, the Constitution requires

16

the source of those statements to personally appear at trial for cross-examination. Because the prosecution did not make Stevens available for cross-examination, it was error to admit her report into evidence and to allow Dickan to recite its contents to the jury. This method of proof violated appellant's right to confront the witness against him as guaranteed by the Sixth Amendment.

We must now decide whether this constitutional violation mandates reversal. "Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless. [Citations.]" (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.) This is a stringent standard. Indeed, the prosecution must prove the jury's verdict was surely unattributable to the evidence that resulted from the violation. (*People v. Pearson* (2013) 56 Cal.4th 393, 463.) If there is a reasonable possibility the evidence contributed to the verdict, we must reverse. (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

The Attorney General claims the drug testing evidence from Stevens' report and Dickan's testimony was unimportant because the only disputed issue at trial was whether appellant possessed the substances found in his possession for purposes of sale; he did not argue to the jury that those substances were anything other than heroin or methamphetamine. However, that trial strategy was dictated by the fact the trial court overruled appellant's objections to Stevens' report and Dickan's testimony about it. Once that evidence was admitted, the defense was in no position to argue the substances appellant possessed were not controlled. (*Duvall v. United States* (D.C.App. 2009) 975 A.2d 839, 848.) Thus, the failure to do so cannot reasonably be construed as an admission. (*Ibid.*)

The Attorney General also contends the drug testing evidence was superfluous because Officer Reedy presented overwhelming evidence the substances appellant possessed contained heroin and methamphetamine. We do not doubt Reedy's

17

testimony was sufficient to sustain appellant's convictions. After all, he testified the substances had the physical characteristics of heroin and methamphetamine, and they came back as such when he subjected them to a presumptive field test. In addition, he testified he found various indicia of drug activity – a scale, syringes, cell phones and money – when he searched appellant and his belongings. This evidence is relevant to our harmless error analysis, of course. However, the question presented is not whether there is sufficient evidence apart from the drug testing evidence to support the jury's verdict, but whether there is a reasonable possibility the drug testing evidence contributed to that verdict. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [in assessing the impact of a constitutional violation, the question "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."]; accord, *People v. Neal* (2003) 31 Cal.4th 63, 87; *People v. Pettie* (2017) 16 Cal.App.5th 23, 70; *People v. Foy* (2016) 245 Cal.App.4th 328, 351.)

As to that issue, we find it significant that in closing argument the prosecutor repeatedly invoked Stevens' report and Dickan's testimony in attempting to persuade the jury that appellant was guilty. The prosecution also discussed Reedy's testimony, of course, but his testimony was primarily aimed at proving the "for-sale" element of the charged offenses, whereas the drug testing evidence was used to establish the more fundamental requirement that the substances found in appellant's possession were in fact prohibited. Since it was scientific in nature, the drug testing evidence was likely the most compelling proof on that issue for the jury, and therefore it is at least reasonably possible that evidence contributed to the jury's verdict. That being the case, the judgment against appellant cannot stand. (See *Duvall v. United States, supra*, 975 A.2d at pp. 842-848 [improper admission of lab report indicating substance found in the defendant's vehicle was marijuana was not harmless error in drug case, even though an officer with specialized training detected the odor of marijuana emanating from the

18

vehicle, he identified the substance as "green weed," and the substance field-tested positive for marijuana].)[1]

## DISPOSITION

The judgment is reversed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

---

[1] Appellant also contends the trial court mishandled his discovery motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Because the judgment must be reversed on Sixth Amendment grounds we need not consider this claim.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | G055726 |
|     Plaintiff and Respondent, | |
|        v. | (Super. Ct. No. 17CF0843) |
| IGNACIO OGAZ, | ORDER GRANTING REQUEST FOR PUBLICATION AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |
|     Defendant and Appellant. | |

The Law Office of Brian N. Gurwitz and the Orange County Public Defender's Office have requested that our opinion in this matter, filed July 14, 2020, be certified for publication. After reviewing the request, we have concluded the case meets the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(2) and (7), the request is GRANTED.

The opinion is ordered published in the Official Reports.

It is hereby ordered that the opinion filed herein on July 14, 2020, be modified in the following particulars:

1. On page 2, before the first paragraph, add the following:

"With the passage of time, we are blessed with more information to draw upon, more history to learn from, more science to apply . . . more chances to improve. While it is sometimes difficult, we try to make the adjustments these resources require. We try to become better than we were.

The criminal law is a pretty good exemplar of these attempts. Based on scientific advances and changing societal mores, the Legislature increases sentences, then decreases them. It defines murder and then redefines it. Striving for the goldilocks statutory scheme that will satisfy our ideas about fairness both now and decades hence, it continually reshapes and polishes the rubrics of criminal practice.

And the judiciary tries to keep pace. We hold those new statutes up to the light of new ideas and try to figure out what lies within and what lies without the boundaries of words like "due process" and "equal protection" and "reasonable doubt." It is often a matter of trying to apply 18th and 19th century ideas to 21st century problems.

Justice Brandeis described the problem well in his famous dissent in *Olmstead v. United States* (1928) 277 U. S. 438, 472-473 (*Olmstead*): "Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. . . . The future is their care, and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be."

Justice Brandeis did not carry the day in *Olmstead*; the court held the new technology of wiretapping a phone was not a violation of the 4th or 5th Amendment. But four decades later the court reversed itself and adopted his position; in *Katz v. United States* (1967) 389 U.S. 347, wiretaps were held to require judicial approval. The application of the Constitution to technology did a one-eighty.

Science and technology present us with some of the most perplexing problems we face, and we always embark upon the application of scientific advances to criminal law with trepidation. In this case we are called upon to reexamine the admissibility of scientific evidence in light of advances in scientific technique that have complicated the rules we've operated under for decades. We are asked to define the confrontation clause in terms applicable to gas chromatography/mass spectrometry analysis. "

2. On page 2, first paragraph, remove the last sentence beginning with "Because appellant . . . ." and replace with the following:

2

"We conclude the Constitution requires the defendant be afforded an opportunity to cross-examine the scientist who performed the analysis.[2]  We must therefore reverse the judgment."

       3.  On page 2, first paragraph in the FACTS section, second sentence, remove the words "that contained" and replace with "where he left".

       4.  On page 2, first paragraph in the FACTS section, fourth sentence, remove the words "That baggie contained" and replace with "Inside that baggie were".

---

[1]      The casual use of the terms "lab tech" and "criminalist" sometimes obscures the fact we are talking here about scientific experts – college-educated scientists who conduct and *understand* scientific testing and the arcane technological bases upon which such tests rest.  They are scientists.  Experts.  They are not just people who print up reports.

These modifications do not effect a change in the judgment.



BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.


4