Filed 1/8/24  P. v. Gil CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061641 |
| v. | (Super. Ct. No. 19CF0671) |
| JUNIOR GIL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Junior Gil of first degree murder, one count of robbery, and two counts of attempted robbery. The jury also found true allegations Gil personally used a firearm in the commission of these offenses and he committed the robbery and attempted robberies for the benefit of a criminal street gang. After the jury returned its verdicts, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699 [Assembly Bill 333]), which made substantive and procedural changes to the law on gang enhancements, took effect. The substantive changes include amendments to the elements of a gang enhancement that narrow the definitions of a "'criminal street gang'" and a "'pattern of criminal gang activity'" as used in Penal Code section 186.22[1] (see *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*)) and alter the definition of what it means to commit a felony "to benefit, promote, further, or assist" a criminal street gang (§ 186.22, subd. (g)). Assembly Bill 333 also "added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*Tran*, at p. 1206.)

Gil filed a motion for new trial, arguing the changes made by Assembly Bill 333 applied retroactively to his case and required the reversal of the gang enhancements and the substantive offenses. After finding Assembly Bill 333's amendments to the gang enhancement's elements applied retroactively and the evidence presented at Gil's trial was insufficient to prove the enhancements under the amended law, the trial court granted Gil's motion for a new trial with respect to the gang enhancements. However, the court denied Gil's motion for a new trial with respect to the substantive offenses, finding the failure to bifurcate the gang enhancements and the admission of the gang evidence did not deprive Gil of a fair trial on the charged crimes.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

On appeal, Gil makes two arguments concerning the admission of the gang evidence. First, he contends his convictions must be reversed because the court committed prejudicial error by admitting the gang evidence, which he asserts "was irrelevant because it did not tend to prove that the crimes were gang related and was incredibly inflammatory and prejudicial." Second, he contends section 1109 applies retroactively and the court's failure to bifurcate the gang evidence in his case violated his right to a fair trial. We reject both arguments.

Gil also contends the prosecutor committed error[2] in his closing argument by misstating the law on aiding and abetting murder. While the prosecutor did not misstate the law, the prosecutor's discussion of the evidence supporting this theory had the potential to confuse the jury. But we conclude any error was harmless. Accordingly, we affirm the judgment.


## FACTUAL AND PROCEDURAL BACKGROUND

*A. The Charging Document*

The district attorney charged Gil with murder (§ 187, subd. (a); count 1); three counts of robbery (§ 211; counts 2–4); two counts of attempted robbery (§§ 221, 664, subd. (a); counts 5–6); and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 7). The amended information alleged Gil personally used a firearm in the commission of the murder (§ 12022.5, subd. (a)) and in the robberies and attempted robberies (§ 12022.53, subd. (b)). The amended information further alleged Gil committed the robberies and attempted robberies for the benefit of or in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

---

[2] We use the term prosecutorial error rather than prosecutorial misconduct because prosecutorial misconduct "'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).) "'A more apt description . . . is prosecutorial error.'" (*Id.* at p. 667.)

*B. The Trial*

1. Pretrial Motions

Prior to trial, the defense moved to bifurcate the substantive counts from the gang allegations.[3] The prosecution opposed bifurcation, arguing the gang evidence was relevant and not prejudicial given the charges. The prosecutor asserted evidence would be presented at trial that as Gil and another man approached the robbery victims, they asked the victims what gang they were from. The prosecutor indicated the evidence at trial would also show one of the victims, W.E., knew Gil as a gang member and identified him by his gang moniker. The defense asserted the prosecution could prove the robbery charges without the gang evidence. The defense did not specifically seek to exclude the gang evidence as irrelevant.

In denying the bifurcation motion, the court found the gang evidence relevant and admissible as its probative value was not substantially outweighed by any unfair prejudice. (See Evid. Code, § 352.) The court indicated it appeared there was gang evidence that would be admissible even if the gang allegations were bifurcated from the substantive charges. The court found W.E.'s identification of Gil by his gang moniker relevant and probative to the witness's identification of Gil as the person who committed the armed robberies and attempted robberies.

The charge of felon in possession of a firearm (count 7) was bifurcated from the remaining charges and Gil waived his right to a jury trial on that charge.

2. The Trial Evidence of the Robbery and Attempted Robberies

Around 5:00 p.m. on December 9, 2018, W.E. was on a bike trail in Santa Ana with two other people, one of whom he knew as S., when they were approached by Gil and another man. Gil and his companion were wearing dark, baggy clothing. W.E.

---

[3] At the time the court heard the pretrial motions, the Legislature had passed Assembly Bill 333, but it had not yet been signed by the Governor.

4

recognized Gil because they had gone to high school together and knew Gil as "Jest." Since high school, W.E. had seen Gil in the neighborhood on McFadden Avenue. W.E. did not know if Gil was in a gang but thought he might be. At trial, W.E. denied Gil or his cohort asked what neighborhood W.E. and the other men were from and he testified they were not "gang banging."

Gil and his companion were both holding guns. They told W.E. and the two other men to empty their pockets and hand over everything they had. W.E. emptied his pockets but did not have any money for Gil to take. Gil pointed his gun at W.E. while his partner tried to take S.'s backpack. W.E. testified Gil and the other individual ultimately gave up on trying to take S.'s backpack. But when interviewed by the police about 10 days after the incident, W.E. told them Gil and Gil's cohort took S.'s backpack. Gil's companion took a few things from S. and the other man. Gil pushed W.E. before Gil and his partner left, running in the direction of Edinger Avenue. A few minutes later, W.E. heard five gunshots coming from that direction.

W.E. spoke to a police detective on December 19, 2018. He identified Gil in a six-pack photographic lineup as the person who robbed him and the two other men. He told the detective he knew Gil as "Jest" and only Gil had a gun during the incident. W.E. also told the detective he hallucinates. However, he testified he remembered the incident actually happened.

3. The Trial Evidence of J.G.'s Murder

Shortly after 5:00 p.m. on December 9, 2018, J.G. left the house with his uncle S.G. to walk to a nearby taco truck. On the way, S.G. stopped to talk to a neighbor, and J.G. continued walking toward the taco truck, which was on St. Andrew Place.

Around the same time, Gil and another man were walking by a market on the same block of St. Andrew Place as the taco truck. The market's exterior surveillance camera captured Gil and the other man walking toward the market at 5:11 p.m. Gil was

wearing a dark hooded sweatshirt and shorts with black shoes. The other man was wearing a dark hooded sweatshirt and light grey shorts and had a backpack. Gil pulled up his sweatshirt's hood to cover his head as the two men walked past the market's front in the direction of the taco truck at nearly 5:13 p.m.

The taco truck's surveillance cameras captured Gil and the other man coming from the market and walking past the taco truck. Gil still had his sweatshirt hood up, covering his head. Less than a minute later in the surveillance video, there were muzzle flashes at the corner of St. Andrew Place and Kilson Drive. The taco truck's customers heard the shots and most ran away.

While S.G. was talking to his neighbor, he heard four gunshots coming from the area of the taco truck. At 5:14 p.m., Gil and his partner ran past S.G. on Hickory Street. While S.G. did not see their faces, their clothing matched that worn by Gil and his cohort. S.G. initially ran after one of the men but then turned around and ran toward the taco truck, concerned about J.G.[4] S.G. found his nephew standing by the taco truck. J.G. told him he had been shot and fell to the ground.

One of the taco truck's customers called 911 to report J.G. had been shot. The call was received at 5:15 p.m.

J.G.'s other uncle, R.G., arrived at the taco truck and administered cardio-pulmonary resuscitation until the paramedics arrived and took over trying to resuscitate J.G. J.G. was taken to the hospital, where he was pronounced dead.

L.C. observed the shooting. He was in his driveway when he saw three males walking on St. Andrew Place. It appeared two men were following J.G. and got J.G.'s attention. When the victim turned around, one of the men shot J.G. three times with a handgun. J.G. fell to the ground and the two men stood over him before running away toward Hickory Street. About 15 seconds later L.C. heard another gunshot. He

---

[4] A home's surveillance camera captured Gil and the other man running past S.G. on Hickory Street and S.G.'s reaction.

6

then saw another man running from the direction of Hickory Street and come to the J.G.'s aid.

L.C. described the two men who followed J.G. as Hispanic males, 20 to 25 years of age, wearing black sweatshirts. He did not see which man shot J.G.

Crime scene investigators found three expended 9-millimeter gun casings at the scene of the shooting. Testing revealed the casings were discharged from the same firearm.

4. Gang Evidence

Police officer Christopher Shynn testified as the prosecution's gang expert. Shynn explained a criminal street gang is a group of three or more members who meet on an ongoing basis and share a common name, color, or sign, and whose primary activities are committing crimes. Discussing Hispanic gang culture, he testified gang members commit crimes to gain respect and elevate their status within the gang because respect is important in the gang culture. Fear and intimidation are also important. According to Shynn, gang members commit crimes in public, in view of the community, to instill fear and intimidation, which deters the community from reporting crimes to the police. In Shynn's experience, potential witnesses to a gang-related crime are often "very hesitant to come forward because of fear and intimidation" and this allows gang members "to get away with certain crimes" because witnesses are unwilling to cooperate.

To generate money for their gang, members sell drugs or commit thefts or robberies. Weapons, including firearms, are important to criminal street gangs to enable them to commit certain crimes, for protection from rivals, and to eliminate rivals. A firearm possessed by a gang member is usually obtained through illegal means and considered as belonging to the whole gang, not an individual member. Members of the same gang are expected to be loyal to each other, back each other up, and be willing to commit crimes together.

7

Shynn testified the gangs in Santa Ana have territories. Within these territories, gang members will conduct criminal activity to generate revenue for their gang. Lopers is a street gang, whose claimed territory is within the southeastern portion of Santa Ana. There are several cliques within the Lopers street gang, including the Minnie Street Lopers, which is close to the intersection of McFadden and Standard Avenues. Members of the Lopers gang use the colors black, white, and gray to display their membership. Shynn, however, acknowledged black sweatshirts are common in all walks of life and not just worn by people associated with the Lopers gang.

Shynn opined the Lopers gang's primary activities as of December 9, 2018 were robberies and illegal firearm possession. He came to this conclusion based on reviewing police reports related to robberies committed by admitted Lopers gang members. The prosecutor presented, through Shynn's testimony and certified court documents, evidence of two predicate acts, to establish a "'pattern of criminal gang activity'" as defined in section 186.22 at the time of trial in 2021. The first was a Lopers gang member who committed two separate robberies in September 2018 and admitted he committed both robberies while armed and for the benefit of the Lopers gang. The second was an active Lopers member who pleaded guilty to committing a robbery in February 2018 while armed with a knife and for the benefit of the Lopers gang. Shynn explained when a Lopers gang member commits a robbery, it benefits the gang as a whole by generating revenue for the gang and instilling fear within the community and benefits the individual gang member by elevating the member's status within the gang.

The bike trail where the robbery and attempted robberies of W.E. and the other two men occurred is a contested area between the Lopers claimed territory and the territory claimed by their rivals the Delhi criminal street gang. Acts of hostility within a contested area are ways for a gang to gain control of that area. If a gang member commits a crime in a contested area, it is considered disrespectful to the rival gang because the rival gang is trying to claim that area as well.

8

W.E. and the robbery victims on the bike trail were not gang members. At least two of them cooperated with the police and gave statements concerning the incident.

Shynn opined Lopers was a criminal street gang on December 9, 2018. Based on his review of Gil's background, which included S.T.E.P.[5] notices and contacts with law enforcement, Shynn opined Gil was an active participant and member of the Lopers criminal street gang on December 9, 2018. An officer issued a S.T.E.P. notice to Gil in 2012, at which time Gil stated he hung out with Lopers members but was not a member himself. Another officer contacted Gil in April 2013 when he was involved in an act of graffiti with another person, which included spray painting the word "Jest." A few months later, in August 2013, another officer had contact with Gil and issued a second S.T.E.P. notice. Two more S.T.E.P. notices were issued to Gil in June 2014, at which time Gil stated he had recently become a member of the Minnie Street Lopers. When an officer contacted Gil in January 2018, Gil admitted being a member of the Lopers gang and said his moniker was "Scar."

Shynn opined, based on facts in a hypothetical that mirrored the prosecutor's evidence, the gang member in the hypothetical committed the crime "at the direction of the Lopers criminal street gang." His opinion was based on his experience investigating the primary activities of the Lopers gang, which includes robberies where Lopers gang members work together to commit the crimes or are directed to commit them by other gang members. But Shynn did not have any evidence a member of Lopers ordered Gil to commit this robbery. He acknowledged, on cross-examination, a gang member can commit a crime for personal benefit and not for the gang's benefit, and

---

[5] "S.T.E.P. is an acronym for the California Street Terrorism Enforcement and Prevention Act set forth in Penal Code section 186.20 et seq." (*In re Ruedas* (2018) 23 Cal.App.5th 777, 784, fn. 2.) A S.T.E.P. "notice informs the recipient that he is associating with a known gang; that the gang engages in criminal activity; and that, if the recipient commits certain crimes with gang members, he may face increased penalties for his conduct." (*People v. Sanchez* (2016) 63 Cal.4th 665, 672.)

therefore, not every crime committed by a gang member is gang related. Nevertheless, Shynn believed "this crime was committed to benefit the Lopers criminal street gang in terms of by Lopers gang members being directed to commit robberies." Shynn testified Lopers gang members are instructed to generate revenue, which assists and benefits the gang to further promote their criminal enterprise using guns. After the prosecutor redirected Shynn back to the hypothetical facts, Shynn testified the hypothetical robbery would benefit the street gang by generating revenue, creating fear within the community, and would send a message to the rival gang because it occurred in a contested area. Shynn indicated the hypothetical robbery would benefit the criminal street gang even if the gang member did not announce his gang because any money produced from the robbery would benefit the gang.

5. Judgment of Acquittal on Counts 3 and 4

At the conclusion of the prosecution's case, the court granted the defense motion for judgment of acquittal (§ 1118.1) as to the robbery charges in counts 3 and 4. The court denied the motion as to the remaining charges and enhancement allegations.

*C. Verdicts*

The jury convicted Gil of first degree murder (count 1), robbery (count 2), and two counts of attempted robbery (counts 5 & 6). The jury also found true the firearm allegations as to these counts and the gang allegations as to the robbery and attempted robbery counts. After the jury's verdicts, the court granted the prosecution's motion to dismiss the charge of felon in possession of a firearm (count 7).

*D. Defense Motion for New Trial and Ruling*

After trial and after Assembly Bill 333 took effect, the defense filed a motion for a new trial as to all counts and allegations pursuant to section 1181, on the

10

ground the court erred in denying the defense motion to bifurcate the gang allegations prior to trial and the evidence at trial was insufficient to prove the gang allegations. The court found Assembly Bill 333's amendments to the elements of the gang allegations applied retroactively because the judgment was not final, and the court vacated the true findings on the gang allegations because the evidence did not satisfy the elements as amended.[6] The court denied the new trial motion as to the substantive offenses.

*E. Sentencing*

At sentencing, the court imposed an indeterminate term of 25 years to life on the murder conviction and a consecutive determinate term of four years for its attending firearm enhancement. As to Gil's robbery conviction, the court imposed a consecutive two-year term. The court imposed concurrent terms of 16 months for the two attempted robbery convictions. Exercising its discretion under section 1385, the court dismissed the firearm enhancements attached to the robbery and attempted robbery convictions. Gil received a total sentence of six years consecutive to 25 years to life.

DISCUSSION

I.

ADMISSION OF GANG EVIDENCE

Gil contends the court committed prejudicial error by admitting the gang evidence. He asserts the gang evidence "was wholly irrelevant to the underlying charges" and its admission violated his due process right to a fair trial. We disagree. The evidence was relevant to prove the gang allegations on the robbery and attempted robbery charges. We conclude the court did not abuse its discretion in admitting the gang evidence and the admission of this evidence did not violate Gil's constitutional rights.

---

[6] The gang allegations were subsequently dismissed.

11

*A. Proceedings in the Trial Court*

After the prosecution was unable to prove a gang hit-up occurred during the robbery and attempted robberies, the defense objected to the prosecution's gang expert's testimony. Prior to the expert taking the stand, the defense objected on the grounds of relevancy, foundation, and speculation, and cited Evidence Code sections 801 and 802. As to the relevancy objection, the defense asserted there was no connection between the gang and the robbery and attempted robberies because there was no evidence a hit-up occurred during these offenses and no evidence the man with Gil was a gang member. The defense argued any opinion testimony offered by the prosecution's gang expert concerning the robbery offenses would be speculative because there was no evidence they were gang related. The court noted a hit-up was not required to make an offense gang related and the expert could consider the facts of the case, including the manner, method, and location of the offense as foundation for the expert's opinion as to whether the offense was for the benefit of or in association with a criminal street gang. The court overruled the defense objection, finding the expert's testimony sufficiently relevant and not unduly prejudicial.

After the prosecution rested, in arguing its section 1118.1 motion, the defense argued the gang allegations should be dismissed because they were not supported by substantial credible evidence. The court disagreed and permitted the gang allegations to proceed to the jury, which found them to be true.

After trial, the defense filed a motion for a new trial as to all counts and allegations pursuant to section 1181. The court granted the motion as to the gang allegations based on the amendments to section 186.22 by Assembly Bill 333. In denying the motion as to the substantive charges, the court determined the admission of the gang evidence did not prejudice Gil. The court noted it gave a limiting instruction to the jury on the proper consideration of the gang evidence, which told the jury it could not consider the gang evidence in determining Gil's guilt on the murder charge. The court

12

further stated: "When I look at the gang evidence that was introduced, I don't believe that it is likely that the jury inferred that you were liable for murder based upon your gang affiliation nor did I believe they inferred you were guilty of robbery based on your gang affiliation. [¶] There's nothing about the gang evidence that the court believe[s] would have inflamed the jury to find you guilty of any of these substantive offenses based only on your gang affiliation. [¶] I would note that the gang evidence that was introduced was not so extraordinarily prejudicial and of so little relevance to guilt that it threatened to sway the jury to convict you regardless of your actual guilt nor do I find that it is reasonably probable that you would have obtained a more favorable verdict in the absence of the gang evidence."

## B.  The Court Did Not Abuse Its Discretion

"[T]he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224–225; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1095.)  A "criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.)  Evidence supporting a gang allegation will be relevant and admissible if not unduly prejudicial. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.)

Even if a gang enhancement is not alleged, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez, supra*, 33 Cal.4th at p. 1049.)  "Gang evidence is relevant and admissible when the very

13

reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego, supra*, 172 Cal.App.4th at p. 1167.)

Here, the gang evidence was relevant to the jury's consideration of the gang allegations and therefore admitted for a legitimate purpose. The prosecution's failure to prove a gang hit-up occurred during the robbery and attempted robberies did not render the gang evidence irrelevant. If anything, it made the gang expert's testimony more probative as to the gang allegation. The jury was tasked with determining whether the robbery and attempted robberies were committed for the benefit of the Lopers criminal street gang. The gang expert's testimony describing the Lopers gang, its colors, its territory, and primary activities, and Gil's status in the gang was relevant to the jury's determination of whether the robbery and attempted robberies were committed for the benefit of the Lopers gang.

Moreover, the evidence of Gil's gang membership was relevant and admissible as to the charged robberies and attempted robberies because it helped bolster W.E.'s identification of Gil as one of his assailants. On cross-examination, the defense attacked W.E.'s identification of Gil as one of his assailants. W.E.'s identification of Gil by his gang moniker reinforced his identification. The gang evidence concerning the primary activities of the Lopers street gang also offered a potential motive for the robbery and attempted robberies. Thus, the court did not abuse its broad discretion when it found the gang evidence was relevant and admissible.

Nor was the gang evidence unduly prejudicial. The evidence of the predicate offenses offered to prove the gang allegations, which would not have been admissible if the gang evidence had been excluded, were not inflammatory. "Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [Gil's] actual guilt." (*People v. Hernandez, supra*, 33 Cal.4th at p. 1051.)

14

Furthermore, the court gave the jury a limiting instruction concerning its consideration of the gang evidence. (CALCRIM No. 1403.) The limiting instruction provided: "1. You may consider evidence of gang activity only for the limited purpose of deciding whether:

"- The defendant acted with the intent, purpose and knowledge that are required to prove the gang related crimes and enhancements charged in counts 2, 5 and 6;

"- The defendant had a motive to commit the crimes charged in counts 2, 5 and 6.

"2. You may consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion as to counts 2, 5 and 6 only.

"3. You may not consider this evidence when deciding whether the defendant committed or aided and abetted the acts alleged in count 1; whether the defendant acted with the required knowledge and/or intent for count 1, or for any other purpose than those stated above in items 1 and 2.

"4. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

For these reasons, we reject Gil's contention admission of the gang evidence rendered his trial fundamentally unfair in violation of his constitutional rights to due process. "'Application of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.'" (*People v. Ramirez, supra*, 13 Cal.5th at p. 1097.) We conclude the court properly admitted the evidence under the applicable rules of evidence. Gil does not persuade us the court's proper application of California's rules of evidence infringed on his constitutional rights.

II.

SECTION 1109

Gil contends recently enacted section 1109, which requires a court to bifurcate gang allegations from the underlying charges if requested by the defense, applies retroactively to his case under the principles of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and therefore the trial court prejudicially erred by failing to bifurcate the gang allegations as he requested before trial. He asserts he is entitled to a remand for a new trial on all the charges because the court's denial of his bifurcation motion resulted in an unfair trial in violation of his right to due process. The Attorney General argues section 1109 applies prospectively only and even if it does apply retroactively, Gil was not prejudiced by the court's failure to bifurcate the gang allegations from the substantive charges.

*A. Retroactivity of Section 1109*

The California Supreme Court has held Assembly Bill 333's amendments to the elements of a section 186.22 gang enhancement apply retroactively under the principles in *Estrada, supra*, 63 Cal.2d 740 because these changes increase the threshold for the imposition of a gang enhancement. (*Tran, supra*, 13 Cal.5th at pp. 1206–1207.) The high court has not yet decided whether section 1109 applies retroactively to nonfinal judgments under *Estrada*'s principles. (*Tran*, at p. 1208.)[7]

The Courts of Appeal are split on the retroactivity of section 1109. Some appellate courts have held section 1109 applies retroactively. (*People v. Montano* (2022) 80 Cal.App.5th 82, 105–108; *People v. Burgos, supra*, 77 Cal.App.5th at p. 568, review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129–1130.) Other courts have concluded section 1109 only applies prospectively. (*People v.*

---

[7] This issue is currently under review in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

*Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090.)  We need not step into this fray and address whether section 1109 applies retroactively because we conclude any error in failing to bifurcate the gang allegations from the substantive offenses was harmless.

*B.  The Failure to Bifurcate the Gang Allegations Was Harmless*

Gil contends the court's failure to bifurcate the gang allegations from the substantive offenses "resulted in 'gross unfairness amounting to a denial of due process'" and requires the issue of whether the error was harmless be reviewed under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), the standard for federal constitutional error. We disagree.  "'[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.'" (*Tran, supra*, 13 Cal.5th at p. 1209.)  Such did not occur here.  The gang evidence was not of a character as to render Gil's trial fundamentally unfair.  It was neither voluminous nor overwhelming.  The gang expert's testimony concerning the Lopers gang was not inflammatory.  Shynn described the gang's primary activities as committing robberies and possessing firearms, offenses which are not particularly inflammatory and would not prejudice the jury against Gil.  The predicate offenses admitted to prove the gang allegations were robberies, not homicides, and did not involve Gil.  Most of the trial testimony concerned the murder, the robbery and the attempted robberies, not Gil's gang membership.  The failure to bifurcate the gang allegations did not render Gil's trial fundamentally unfair, and therefore, the *Chapman* standard does not apply.

Instead, the standard for state law error, *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), is appropriate here.  Under the *Watson* standard, Gil must establish it is reasonably probable he would have obtained a more favorable result if the gang

17

allegations had been bifurcated from the murder, robbery, and attempted robbery charges. (See *Watson*, at p. 836.) We conclude Gil has not carried his burden of demonstrating prejudice from the court's failure to bifurcate the gang allegations from the substantive charges. It is not reasonably probable the jury would have reached a different outcome on the murder, robbery, and attempted robbery charges if the gang allegations had been bifurcated.

There was strong evidence of Gil's guilt on the robbery and attempted robbery charges. W.E. provided convincing testimony Gil attempted to rob him at gun point and Gil robbed and attempted to rob the two men with W.E. Gil contends the gang evidence was prejudicial to his robbery and attempted robbery convictions because the identification evidence was not overwhelming. We disagree. W.E. testified he knew Gil from school and seeing him around the neighborhood and recognized him during the robbery incident. W.E. identified Gil in a six-pack photographic lineup about 10 days after the incident. While W.E. admitted he had regular hallucinations, he was certain the robbery incident occurred.

The evidence was also strong on the murder charge. The prosecution relied on the video surveillance evidence showing Gil's actions before and after the shooting, the statements L.C. made shortly after the shooting, and the robbery evidence. Minutes before the murder, Gil used a gun when committing the robbery and attempted robberies of W.E. and the two men. A few minutes after the robbery incident, Gil is seen on video surveillance pulling his sweatshirt hood over his head as he and his partner walked from the market, past the taco truck, and in the direction of where J.G. was shot. The shooting occurred less than a minute after Gil walked past the taco truck and the muzzle flashes from the shooting were visible in the taco truck's surveillance camera video. The jury also saw videos from other cameras that show Gil and his cohort running on nearby streets after the shooting. Although at trial he repeatedly professed he was unable to remember anything he saw the night of the shooting, L.C. told a police officer he saw two

18

men following J.G. and as the two men approached J.G., one of the men shot J.G. with a handgun three times.

Gil acknowledges the court instructed the jury not to consider the gang evidence when determining his guilt on the murder count, but he contends the limiting instruction would not have prevented the jury from doing such. He asserts because the instruction only limited the jury's consideration of "'evidence of gang activity,'" the jury would have believed it could consider his gang status when determining his guilt on the murder charge. It is not reasonably likely the jury would have interpreted the limiting instruction in this fashion.

"It is proper for this court to consider '"whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result."'" (*People v. Session* (2023) 93 Cal.App.5th 723, 735.) Here, "[g]iven the overwhelming evidence of guilt and lack of any credible defense theory in response, it is not reasonably likely that a bifurcated trial would have changed the jury's verdict." (*Tran, supra*, 13 Cal.5th at p. 1210.) Accordingly, we find harmless any error by the court in not bifurcating the gang allegations.

### III.

### PROSECUTORIAL ERROR

Gil argues the prosecutor erred in his closing argument by misstating the law on aiding and abetting murder. While the prosecutor correctly stated the law, his application of it to the evidence had the potential to mislead the jury. Even assuming the prosecutor committed error, it was harmless.

*A. Applicable Law*

"Under state law, "'[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . .'" [Citation.] Prosecutorial misconduct violates the federal Constitution when it results in a fundamentally unfair trial. [Citation.] When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion." (*People v. Steskal* (2021) 11 Cal.5th 332, 350.)

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].'" (*Centeno, supra*, 60 Cal.4th at p. 666.) "For such remarks to constitute error, however, it is not enough that the remarks could be construed as improper. [Citation.] Instead, '[a] defendant asserting prosecutorial misconduct must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.'" (*People v. Potts* (2019) 6 Cal.5th 1012, 1036.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'" (*Centeno, supra*, 60 Cal.4th at p. 667.)

*B. The Prosecutor's Argument*

The jury was instructed it could find Gil guilty of the murder of J.G. as a direct perpetrator or as an aider and abettor. The court did not instruct on felony murder.

In arguing Gil was guilty of murder, the prosecutor's primary theory was Gil was the direct perpetrator who shot and killed J.G. In his closing argument, the prosecutor went through the elements of first degree murder and explained how the evidence supported these elements and showed Gil was the shooter.

Anticipating the defense argument would be Gil's companion was the shooter, the prosecutor also addressed how Gil was guilty as an aider and abettor of

20

implied malice murder. The prosecutor argued: "Now, again, there are two ways to guilt. As a perpetrator and as an aider and abettor. The perpetrator is the person who directly committed the crime. Aider and abettor aided and abetted that perpetrator. And the bank robbery example we talked about, it's the person who takes the money. The person who goes to the register and asks for the money. In our case, it's the shooter.

"The aider and abettor, in the bank robbery example, we talked about different roles that people would have that help the person who's actually at the register demanding the money, whether it's the getaway driver, whether it's the lookout, or whether it's the person at the inside job at the bank who's kind of giving them clues as to, 'go to this register.'

"Whether the aider and abettor is at the scene or not, you can still be guilty. And in this case, the aider and abettor is the second murderer. The person who assists the shooter.

"I'll submit to you, ladies and gentlemen, the aider and abettor in this situation is that second unidentified suspect. [Gil] here is the perpetrator. Is the shooter. But for your purpose, I'm going to go through this if for some reason one of you believes that perhaps it was the other person who was the shooter. I'll go through it to show how the defendant is guilty under either theory.

"The basic concept is if I'm helping you rob someone while you are armed with a handgun, I know that that conduct is inherently dangerous to human life. The bottom line is they're both guilty. They're both guilty under that implied malice. So to prove that the defendant is guilty of a crime based on aiding and abetting that crime —"

Defense counsel objected on the ground the prosecutor misstated the law under *People v. Banks* (2014) 59 Cal.4th 1113. The court did not expressly rule on the objection but told the jurors it had provided the instructions to guide their deliberations and if anything the attorneys said conflicted with the court's instructions, they must

21

follow the court's instructions. The prosecutor reiterated the court's advisement, telling the jury to follow the law provided by the judge.

The prosecutor continued with his argument Gil was guilty of murder as an aider and abettor, discussing the elements of aiding and abetting in CALCRIM No. 401. The prosecutor argued: "And as an aider and abettor, the aider and abettor can be guilty if four elements are proven.

"First, that the perpetrator committed the crime. We've talked about how the shooter is guilty of the murder.

"The second element is that the defendant knew that the perpetrator intended to commit the crime. So let's look at what the defendant knew before the fatal shooting.

"He knew that he and his crime partner were out committing armed robberies.

"He knew that they were both armed with a firearm.

"He knew that he himself had already pointed a gun at someone's head.

"Neither of them were scared during or after that first robbery. You can tell because you can see [Gil]'s facial expression as he's walking past the . . . Market. These two guys just got off on robbing someone at the bike trail. It hyped them up. He's a 24-year-old man. Instead of being scared like a normal person would, this only made him feel tougher. Let's go out and do more. He was thirsty for more.

"So ten minutes before the murder, the defendant knew that he was armed. Knew that his partner was armed. Knew that they were out hunting for victims together to rob. Knew that it was a joint effort. Knew that a gun was pointed two feet from the head of a victim to reach the goal. These are things that he knew before doing them.

"And so when the defendant gets ten minutes later to the scene of the murder, he's already known this. He's in that same state of mind. This is one continuous course of conduct. So he knew what they were out there doing.

22

"Third element.  That before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime.

"The instruction goes on and says someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"Again, this is one continuous course of conduct.  The two suspects promoted, instigate one another.  After they got off that robbery, they're on a high.  Let's go do more.  They're pumping each other up.  It's evident from the fact that they continued to commit the same conduct after that first robbery.  They're ready for more.  It only emboldened them.  Again, neither of them left the other.  They were both ready and they were in it together.  That's met.

"And, four, that the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of that crime.  The act of having a second person present during a robbery allows the shooter to do something he would otherwise be unwilling to do, which is approach a group of people.  There's power in numbers when people are together.

"[¶] . . . [¶] Again, we look at the different roles.  You can't commit this type of robbery alone out on the streets.  In the [W.E.] situation at the bike trail, there has to be a second person because you can't approach three people, go through their pockets, all the while holding a gun to their head.  What are the chances it's going to go three on one?  So it has to be split up.  And, again, being a lookout in case anyone unrelated intervenes.  This is all conduct that each of these two people did, in fact, aid one another.  This is met.

"So under either theory, the defendant is guilty.  And it's important to note you guys don't all have to agree which role he played.  Just that he played a role, and that

he had a requisite intent.  So it can be six thinking aider and abettor, six thinking he's the perpetrator, but here, ladies and gentlemen, the evidence shows he is the perpetrator."

## C. *The Error Was Harmless*

Gil contends the prosecutor misstated the law on aiding and abetting murder by arguing Gil could be found guilty of murder if the jury found he aided and abetted an armed, attempted robbery of J.G.  While the prosecutor correctly stated the elements of aiding and abetting contained in CALCRIM No. 401, his application of the elements to the evidence had the potential of confusing the jury.

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.  [Citation.]  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*People v. Reyes* (2023) 14 Cal.5th 981, 990–991.) "[I]mplied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator." (*Id.* at p. 992.)

Nevertheless, even if the prosecutor's statements were a misstatement of the law, it is not reasonably probable Gil would have enjoyed a more favorable result in the absence of the error.  (See *Watson, supra*, 46 Cal.2d at p. 836.)  The court properly instructed the jury on the elements of murder (CALCRIM No. 520) and on aiding and abetting liability (CALCRIM No. 401).  "'[W]e presume that jurors treat the court's

24

instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] '[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the "statements of advocates." Thus, argument should "not be judged as having the same force as an instruction from the court."'" (*People v. Cortez* (2016) 63 Cal.4th 101, 131–132.)

Moreover, the record indicates the jury found Gil was the direct perpetrator of the first degree murder as the jury found he personally used a firearm in the commission of the murder, after the jury was instructed it could not rely on the aiding and abetting theory to return a true finding on the firearm allegation. Accordingly, we conclude any error by the prosecutor in closing argument concerning aider and abettor liability for murder was harmless.

## DISPOSITION

The judgment is affirmed.

MOTOIKE, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

DELANEY, J.

25